**International Court of Arbitration of the**
**International Chamber of Commerce**
**Ref. N° 23069/GR**

---

# FINAL AWARD

in the Arbitration between

**URANGESELLSCHAFT GmbH (Germany)**

<u>Claimant</u>

and

**NYNCO TRADING LTD (U.S.A)**

<u>Respondent</u>

Jointly referred to as the "Parties"

## TABLE OF CONTENTS

I.    NAME AND DESCRIPTION OF THE PARTIES AND THEIR COUNSEL..................................4
    A.    Claimant...................................................................................................4
    B.    Respondent .............................................................................................4
II.   THE SOLE ARBITRATOR ..........................................................................................5
III.  THE ARBITRATION CLAUSE .....................................................................................5
IV.  PLACE OF ARBITRATION AND LANGUAGE OF THE PROCEEDINGS....................................6
V.   THE APPLICABLE LAW .............................................................................................6
    A.    Applicable Procedural Law.......................................................................6
    B.    Applicable Substantive Law .....................................................................7
VI.  SUMMARY OF THE PROCEDURAL HISTORY ...............................................................7
VII. THE PARTIES' PRAYERS FOR RELIEF ......................................................................15
    A.    Claimant.................................................................................................15
    B.    Respondent ...........................................................................................17
VIII. FACTS ..............................................................................................................18
    A.    Introduction ...........................................................................................18
    B.    The Parties, related entities and background .........................................18
    C.    The negotiation of the U/N Contract .......................................................19
    D.    The U/N Contract ...................................................................................20
    E.    Respondent's contract with Dioxitek (the N/D Contract) .........................22
    F.    The amendments to the U/N Contract .....................................................23
    G.    The performance of the U/N Contract from 2012 to 2015 ........................23
    H.    Delays and difficulties in summer 2016 ..................................................24
    I.    The amended delivery schedule of 20 September 2016............................25
    J.    The amended delivery schedule of 21 December 2016.............................26
    K.    The amended delivery schedule of 3 February 2017 ................................26
    L.    Dioxitek's letter to Respondent of 9 May 2017 .......................................28
    M.   Claimant's Notice of 9 June 2017 ...........................................................29
    N.   Claimant's termination letter of 1 September 2017 ..................................31
    O.   Claimant's Request for Arbitration of 5 September 2017 ..........................31
    P.    The Payment Schedule of 28 September 2017.........................................32
IX.  ASSESSMENT OF THE FACTS AND LEGAL ANALYSIS ..................................................33
    A.    Introduction ...........................................................................................33
    B.    Applicable legal framework ....................................................................33
    C.    Defences invoked by Respondent ..........................................................33
         1)    Introduction ................................................................................33
         2)    Respondent's position .................................................................34
             i)    Force majeure .................................................................34
             ii)   Nature of the contractual relationship (the U/N Contract as a "screen")
                                       ....................................................................................34

3)   Claimant's position .................................................................... 37
    i)    Force majeure ............................................................... 37
    ii)   Nature of the contractual relationship (the U/N Contract as a "screen")
          ........................................................................... 38
4)   The Sole Arbitrator's determinations .......................................... 39
    i)    Force majeure ............................................................... 39
    ii)   Nature of the contractual relationship (the U/N Contract as a "screen")
          ........................................................................... 46
D.   Claimant's claim for outstanding payment for the delivery of June 2016 ............ 48
    1)   Claimant's position .......................................................... 48
    2)   Respondent's position ........................................................ 48
    3)   The Sole Arbitrator's determinations ......................................... 49
E.   Claimant's claim for interest ...................................................... 50
    1)   Claimant's position .......................................................... 50
    2)   Respondent's position ........................................................ 50
    3)   The Sole Arbitrator's determinations ......................................... 50
F.   Claimant's claim for damages for breach of obligations to take delivery during
     the years 2016-2019 ............................................................... 51
    1)   Claimant's position .......................................................... 51
    2)   Respondent's position ........................................................ 52
    3)   The Sole Arbitrator's determinations ......................................... 53
G.   Respondent's counterclaims against Claimant ....................................... 55
    1)   Respondent's position ........................................................ 55
    2)   Claimant's position .......................................................... 56
    3)   The Sole Arbitrator's determinations ......................................... 57
H.   Analysis of the Parties' prayers for relief ........................................ 58
    1)   Claimant's prayers for relief ................................................ 58
    2)   Respondent's prayers for relief .............................................. 60
X.   COSTS ................................................................................... 61
A.   Introduction ....................................................................... 61
B.   Determination and apportionment of the Costs of Arbitration ....................... 61
    1)   Fees and expenses of the Sole Arbitrator and ICC ("ICC Costs of
         Arbitration") ................................................................ 61
    2)   Costs claimed by the Parties, including legal fees and other costs ........... 62
    3)   Allocation of costs .......................................................... 62
XI.  DISPOSITIVE SECTION OF THIS FINAL AWARD ................................................. 64

## I.   NAME AND DESCRIPTION OF THE PARTIES AND THEIR COUNSEL

### A.   CLAIMANT

1.   The claimant, Urangesellschaft GmbH ("**UG**" or "**Claimant**"), is a company organized and existing under the laws of Germany. Claimant has its registered office at the following address:

   Solmsstrasse 12
   D-60486 Frankfurt am Main
   Germany

2.   Claimant is represented in this arbitration by:

   Mr Christophe Seraglini
   Ms Camille Teynier
   Freshfields Bruckhaus Deringer LLP
   2 rue Paul Cézanne
   75008 Paris
   Emails : christophe.seraglini@freshfields.com
            camille.teynier@freshfields.com

### B.   RESPONDENT

3.   The respondent, Nynco Trading Ltd. ("**Nynco**" or "**Respondent**"), is a company organized and existing under the laws of the U.S.A. Respondent has its registered office at the following address:

   Att: Mr Joseph McCourt
   69 Tunstall Road
   P.O. Box 238
   Scarsdale
   New York, 10583
   U.S.A
   Email: jm@uranium.com

4.   As from 20 December 2019, Respondent is no longer represented by counsel and Mr Joseph McCourt has been acting on behalf of Respondent (see § 87 below).

## II.   THE SOLE ARBITRATOR

5.   <u>On 13 March 2018</u>, the Secretary General of the International Court of Arbitration of the International Chamber of Commerce (the "**Secretary General**"), pursuant to Article 13(2) of the ICC Rules of Arbitration in force as from 1 March 2017 (the "**ICC Rules**"), confirmed Prof. Sébastien Besson as Sole Arbitrator upon the joint nomination of the Parties.

Prof. Sébastien Besson's contact details are as follows:

LÉVY KAUFMANN-KOHLER
3-5, rue du Conseil-Général
Case Postale 552
CH-1211 Geneva 4
Switzerland
Email:   sebastien.besson@lk-k.com

## III.   THE ARBITRATION CLAUSE

6.   The arbitration clause is contained in Article 16 of the *"Contract for the Sale of 940,000 kg Uranium as Natural Uranium Ore Concentrate"* signed by *"Urangesellschaft GmbH"* (Claimant) and *"Nynco Trading Ltd."* (Respondent) on 19/21 March 2012 (the "**U/N Contract**") (<u>Exhibit C-8</u>) (see § 129 below). This provision reads as follows:

> *"**Article 16:    Governing Law and Arbitration***
>
> *This Contract shall be governed by and construed in accordance with the substantive law of Switzerland without regard to principles of law that might make the law of some other jurisdiction applicable (conflict of laws). The Parties shall endeavor to settle any dispute arising from the execution of or in connection with this Contract amicably. In the event that either the Seller or the Buyer declare by written notice specifying such dispute that an agreement could not be reached within a reasonable timeframe, any dispute, controversy or claim arising out of or relating to this Contract or the breach, termination or invalidity hereof, shall be exclusively settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "Rules") by one arbitrator appointed in accordance with the said Rules excluding, however, in any event whatsoever, any procedures as to discovery.*

> *The place of arbitration shall be Lausanne, Switzerland. The language to be used in the arbitral proceedings shall be English.*
>
> *The arbitral award shall be final and binding upon all Parties. All costs and expenses incurred in connection with any arbitral proceedings hereunder shall be borne by the losing Party, except as otherwise provided in the arbitral award."*

(Exhibit C-8, p. 11)

## IV.   PLACE OF ARBITRATION AND LANGUAGE OF THE PROCEEDINGS

7.   Article 16 of the U/N Contract provides for arbitration in Lausanne, Switzerland (Exhibit C-8, p. 11).

## V.   THE APPLICABLE LAW

### A.   APPLICABLE PROCEDURAL LAW

8.   Article 16 of the U/N Contract provides that any dispute shall be settled in accordance with the ICC Rules.

9.   Article 10.1 of the Terms of Reference executed between the Sole Arbitrator and the Parties provides that:

> *"The arbitration shall be conducted in accordance with the mandatory provisions of Chapter 12 of the Swiss Private International Law Act, the ICC Rules in force as from 1 March 2017, the present Terms of Reference and the "**Specific Procedural Rules**" to be issued by the Sole Arbitrator after consultation with the Parties in accordance with Article 19 of the ICC Rules. Where these rules are silent, the proceedings shall be governed by the rules which the Sole Arbitrator will issue after consultation with the Parties pursuant to Article 19 of the ICC Rules."*

**B.    APPLICABLE SUBSTANTIVE LAW**

10.    Article 16 of the U/N Contract provides that *"[t]his Contract shall be governed by and construed in accordance with the substantive law of Switzerland without regard to principles of law that might make the law of some other jurisdiction applicable (conflict of laws)"* (Exhibit C-8, p. 11).

**VI.    SUMMARY OF THE PROCEDURAL HISTORY**

11.    The summary of the procedural history below sets out the main and relevant steps of the procedure. It does not seek to present in an exhaustive manner each and every procedural activity carried out in the arbitration. Further, the financial aspects of the proceedings, including correspondence related to the determination and payment of the advance on costs, are not dealt with in this section, but will be addressed in Section **X** below.

12.    On 5 September 2017, Claimant filed with the Secretariat of the International Court of Arbitration of the International Chamber of Commerce (the "**ICC Secretariat**") a Request for Arbitration (the "**Request**") against Respondent. The Request was accompanied by Exhibits C-1 to C-40.

13.    On 8 September 2017, the ICC Secretariat acknowledged receipt of the Request and assigned the reference number 23069/GR to the proceedings.

14.    On 12 September 2017, the ICC Secretariat notified the Request to Respondent and, pursuant to Article 5(1) ICC Rules, invited Respondent to submit its Answer to the Request (the "**Answer**") within thirty days.

15.    In the same letter and in a separate letter to Claimant on the same day, the ICC Secretariat noted that the arbitration agreement provided for one arbitrator and that, if Claimant and Respondent failed to nominate an arbitrator within thirty days from the date Respondent received the Request or any additional time allowed by the ICC Secretariat, the International Court of Arbitration of the International Chamber of Commerce (the "**ICC Court**") would appoint the arbitrator in accordance with Article 12(3) ICC Rules.

16.    On 11 October 2017, Respondent informed the ICC Secretariat that it would submit a Request for Joinder of Dioxitek S.A. ("**Dioxitek**") to the proceedings and requested an extension of time to file its Answer.

17.    On 13 October 2017, the ICC Secretariat granted Respondent an extension of time until 17 November 2017 to file its Answer. In the same letter, the ICC Secretariat invited Respondent to file any Request for Joinder by the same date, 17 November 2017.

18.    On 23 October 2017, Respondent filed its **Request for Joinder** of Dioxitek. Respondent's Request for Joinder was accompanied by Exhibits RJ-1 to RJ-31.

19.    In its Request for Joinder, Respondent also requested an additional extension of time to file its Answer.

20.    On 8 November 2017, the ICC Secretariat acknowledged receipt of the Request for Joinder and invited Claimant to file any pleas pursuant to Article 6(3) ICC Rules within thirty days. In the same letter, the ICC Secretariat indicated that, unless Claimant, by 10 November 2017, agreed to Respondent's request for an additional extension of time to file the Answer, such request for additional extension of time would be denied.

21.    On the same day, 8 November 2017, the ICC Secretariat notified the Request for Joinder to Dioxitek and invited Dioxitek to submit an Answer to the Request for Joinder within thirty days.

22.    On 10 November 2017, Claimant informed the ICC Secretariat that it would submit pleas pursuant to Article 6(3) ICC Rules and that it would agree to additional fifteen days extension of time for Respondent to file the Answer.

23.    On the same day, 10 November 2017, with reference to Claimant's letter of the same day, Respondent requested that the additional extension of time to file the Answer be prolonged until Monday 4 December 2017.

24.    On 13 November 2017, the ICC Secretariat granted Respondent an additional extension of time until 4 December 2017 to file its Answer.

25.    On 4 December 2017, Respondent filed its **Answer** together with <u>Exhibits R-1 to R-4</u>.

26.    On 6 December 2017, the ICC Secretariat acknowledged receipt of the Answer and informed the Parties that it would revert to the Parties in due course regarding the constitution of the arbitral tribunal.

27.    On 7 December 2017, Dioxitek requested sixty days extension of time to file its Answer to the Request for Joinder.

28.    On 11 December 2017, Claimant filed **Objections to the Request for Joinder** pursuant to Article 6(3) ICC Rules. Claimant's Objections to the Request for Joinder was accompanied by <u>Exhibits CL-1 to CL-21</u>.

29.    On 13 December 2017, the ICC Secretariat granted Dioxitek a preliminary extension of time until 15 January 2018 to file its Answer to the Request for Joinder and invited Claimant and Respondent to provide their comments on Dioxitek's request for a further extension of time by 18 December 2017.

30.    On 14 December 2017, Respondent indicated that it would not object to a further extension of time until end of January 2018 for Dioxitek to file its Answer to the Request for Joinder.

31.  On the same day, 14 December 2017, Claimant indicated that it would object to any further extension of time for Dioxitek to file its Answer to the Request for Joinder.

32.  On 15 December 2017, the ICC Secretariat confirmed that the time limit for Dioxitek's Answer to the Request for Joinder was maintained at 15 January 2018.

33.  On 15 January 2018, Dioxitek filed its **Answer to the Request for Joinder** wherein it raised pleas pursuant to Article 6(3) ICC Rules.

34.  On 18 January 2018, the ICC Secretariat acknowledged receipt of Dioxitek's Answer to the Request for Joinder and informed the Parties that it had referred the matter to the ICC Court for decision pursuant to Article 6(4) ICC Rules. In the same letter, the ICC Secretariat invited the Parties to present any additional comments in that respect by 25 January 2018.

35.  On 9 February 2018, the ICC Secretariat informed the Parties that, on 8 February 2018 and pursuant to Article 6(4) ICC Rules, the ICC Court had decided that the arbitration would proceed against Dioxitek.

36.  In the same letter, the ICC Secretariat invited the Parties to indicate, by 16 February 2018, how they wished to proceed with respect to the constitution of the arbitral tribunal.

37.  On 15 February 2018, the Parties informed the ICC Secretariat that they had agreed to attempt to jointly nominate a sole arbitrator by 5 March 2018.

38.  On 1 March 2018, the Parties informed the ICC Secretariat that they had agreed on jointly nominating Prof. Sébastien Besson as Sole Arbitrator.

39.  On 14 March 2018, the ICC Secretariat informed the Parties that the Secretary General, on 13 March 2018 and pursuant to Article 13(2) ICC Rules, had confirmed Prof. Sébastien Besson as Sole Arbitrator upon the joint nomination of the Parties.

40.  The arbitration file was transmitted to the Sole Arbitrator on 14 March 2018.

41.  On 30 March 2018, the Sole Arbitrator provided the Parties with draft Terms of Reference and draft Specific Procedural Rules (Procedural Order No. 1) designed to apply to the proceedings. The Parties were invited to comment on such drafts and to submit summaries of their respective positions for inclusion in the Terms of Reference on or before 16 April 2018.

42.  On 16 April 2018, the Parties submitted their comments on the draft Terms of Reference and draft Procedural Order No.1.

43.  On 17 April 2018, the Parties informed the Sole Arbitrator that they had discussed the procedural timetable but failed to agree on Claimant's and Dioxitek's proposals to bifurcate the issue of jurisdiction.

44.  In its email of 17 April 2018, Respondent provided a summary of its position on bifurcation.

45.  In their emails of the same day, 17 April 2018, Claimant and Dioxitek announced that they would submit brief *"notes"* on bifurcation ahead of the case management conference call scheduled to be held on 27 April 2018.

46.  On 20 April 2018, Claimant and Dioxitek submitted brief notes on bifurcation.

47.  Claimant's note on bifurcation was accompanied by additional Exhibits CL-22 to CL-26.

48.  On 23 April 2018, the Parties provided the Sole Arbitrator with consolidated comments on the draft Terms of Reference and draft Procedural Order No.1.

49.  On 27 April 2018, the Sole Arbitrator and the Parties held a case management conference call during which they discussed, among other things, the draft Terms of Reference, the draft Procedural Order No. 1, the procedural timetable and Claimant's and Dioxitek's proposals to bifurcate the issue of jurisdiction. In particular, the Sole Arbitrator and the Parties finalized the Terms of Reference and agreed that the Sole Arbitrator would decide on the issue of bifurcation after the call.

50.  On 30 April 2018, the Sole Arbitrator summarized the discussion and agreements reached during the case management telephone conference.

51.  By the same letter, the Sole Arbitrator notified to the Parties **Procedural Order No. 1** and circulated the final Terms of Reference for signature.

52.  On 17 May 2018, the Sole Arbitrator issued **Procedural Order No. 2** concerning Claimant's Dioxitek's requests for bifurcation of the proceedings and sequence of briefs. The Sole Arbitrator decided to bifurcate the proceedings and to have Respondent file its submissions on jurisdiction first, followed by Claimant's and Dioxitek's submissions on jurisdiction. The Sole Arbitrator also invited the Parties to liaise with each other and to propose, by 25 May 2018, a procedural timetable for the first phase of the proceedings.

53.  On 25 May 2018, the Parties requested and obtained an extension of time until 30 May 2018 to make a proposal for the procedural timetable.

54.  On 29 May 2018, the ICC Secretariat informed the Sole Arbitrator and the Parties that the ICC Court, on 3 May 2018, had extended the time limit for establishing the Terms of Reference until 29 June 2018, pursuant to Article 23(2) ICC Rules.

55.  On 30 May 2018, the Parties submitted a proposed procedural timetable for the first phase of the proceedings.

56.  On 1 June 2018, the Sole Arbitrator notified to the Parties the **Terms of Reference** last signed on 31 May 2018.

57.  On 11 June 2018, the Sole Arbitrator notified to the Parties the **Procedural Timetable** for the first phase of the proceedings.

58.  On 21 June 2018, the ICC Secretariat informed the Sole Arbitrator and the Parties that the ICC Court had fixed 29 March 2019 as the time limit for the Award, pursuant to Article 31(1) ICC Rules.

59.  On 14 August 2018, Respondent filed its First Submission on Jurisdiction ("**Respondent's First SoJ**") together with the Witness Statement of Mr Daniel Einbund (R-WS-1) and additional Exhibits R-5 to R-23 and RL-1 to RL-6.

60.  On 15 October 2018, Claimant and Dioxitek each filed their First Submissions on Jurisdiction.

61.  Claimant's First Submission on Jurisdiction ("**Claimant's First SoJ**") was accompanied by additional Exhibit CL-27.

62.  On 21 November 2018, Respondent filed its Second Submission on Jurisdiction ("**Respondent's Second SoJ**") together with additional Exhibits R-24 and RL-7 to RL-34.

63.  On 29 November 2018, Claimant requested that the Sole Arbitrator rule on the admissibility of certain information and evidence disclosed in Respondent's First SoJ and Respondent's Second SoJ relating to settlement discussions between the Parties.

64.  On 12 December 2018, Respondent took position on Claimant's request of 29 November 2018 and argued that it should be dismissed.

65.  On the same day, 12 December 2018, Dioxitek indicated that it agreed with Claimant's request of 29 November 2018.

66.  On 17 December 2018, the Sole Arbitrator **issued Procedural Order No. 3** dismissing Claimant's request to declare inadmissible certain information and evidence disclosed in Respondent's First SoJ and Respondent's Second SoJ relating to settlement discussions between the Parties.

67.  On the same day, 17 December 2018, and with reference to Article 11 ICC Rules, the Sole Arbitrator made a disclosure relating to another ICC arbitration.

68.  On 18 and 20 December 2018, the Parties confirmed that they did not have any objections or concerns further to the Sole Arbitrator's disclosure of 17 December 2018.

69.  On 21 December 2018, Claimant and Dioxitek submitted their Second Submissions on Jurisdiction.

70.  Claimant's Second Submission on Jurisdiction ("**Claimant's Second SoJ**") was accompanied by additional Exhibits C-41 and CL-28 to CL-31.

71. On the same day, 21 December 2018, Claimant and Dioxitek indicated that they did not consider that a hearing would be necessary in this first phase of the proceedings.

72. On 22 December 2018, the Sole Arbitrator informed the Parties that he understood that no Party requested a hearing and that he could proceed to issue the partial award on jurisdiction on the basis of the submissions and evidence filed by the Parties to date. The Sole Arbitrator invited the Parties to object, by 28 December 2018, if such understanding was not correct.

73. On 27 December 2018, Respondent confirmed that it considered that a hearing would not be necessary in this first phase of the proceedings.

74. On 7 January 2018, the Sole Arbitrator confirmed that the hearing dates were released and that he would proceed to issue the partial award on jurisdiction on the basis of the submissions and evidence filed by the Parties to date.

75. On 28 January 2019, the Sole Arbitrator invited the Parties to submit their Statements on Costs incurred in the first phase of the proceedings.

76. On 13 February 2019, the Parties submitted their Statements on Costs incurred in the first phase of the proceedings.

77. Respondent's Statement on Costs was accompanied by additional <u>Exhibits R-25 and R-26</u>.

78. On 28 March 2019, the Sole Arbitrator declared the proceedings closed with respect to the issues of this first phase of the arbitration.

79. On 19 April 2019, the ICC Secretariat notified to the Parties the Sole Arbitrator's Partial Award on Jurisdiction dated 18 April 2019 (the "**Partial Award**").

80. In the Partial Award, the Sole Arbitrator dismissed Respondent's Request for Joinder and declared that he did not have jurisdiction over Dioxitek. As a result of the Partial Award, the arbitral proceedings continued only between Claimant and Respondent.

81. On 9 May 2019, the Sole Arbitrator invited the Parties (Claimant and Respondent) to liaise with each other with a view to agreeing on the procedural timetable for the second phase of the proceedings.

82. On 3 June 2019, the Parties provided the Sole Arbitrator with a joint proposal for the procedural timetable.

83. On 25 June 2019, the Sole Arbitrator confirmed his agreement with the procedural steps agreed between the Parties and proposed specific dates for the hearing envisaged in June 2020.

84. On 4 and 6 July 2019, the Parties confirmed their availabilities for the hearing dates proposed by the Sole Arbitrator.

85. On 8 July 2019, the Sole Arbitrator notified to the Parties the **Procedural Timetable** for the second phase of the proceedings.

86. On 30 September 2019, Claimant filed its Statement of Claim (the "**SoC**") together with additional Exhibits C-42 to C-46 and CL-32 to CL-38.

87. On 18 and 20 December 2019, the then counsel for Respondent informed the Sole Arbitrator and Claimant that they were no longer representing Respondent.

88. On 27 January 2020, Respondent (represented by Mr Joseph McCourt) submitted to the Sole Arbitrator its Statement of Defence (the "**SoD**") together with three supporting documents.

89. On 6 February 2020, Claimant informed the Sole Arbitrator that it had not received Respondent's SoD.

90. On the same day, 6 February 2020, the Sole Arbitrator forwarded the SoD to Claimant and invited the Parties to copy each other in all communications with the Sole Arbitrator as envisaged in Procedural Order No.1.

91. On 19 March 2020, with reference to the global health situation relating to Covid-19, Claimant requested two weeks extension of time to file its Reply. The extension was granted by the Sole Arbitrator on the same day.

92. On 3 April 2020, Claimant filed its **Reply** together with additional Exhibit C-47.

93. On 16 April 2020, in light of the global health situation as well as the procedural situation, in particular the absence of witness statements and expert reports related to the second phase of the proceedings, the Sole Arbitrator invited the Parties to provide their views on i) the need to maintain the hearing envisaged on 17-19 June 2020 and, if applicable, ii) the format of such hearing.

94. On 20 April 2020, with reference to the global health situation relating to Covid-19, Respondent requested seven weeks extension of time to file its Rejoinder.

95. On 24 April 2020, Claimant commented on Respondent's request for extension of time and requested that the Sole Arbitrator fix a new time limit for the submission of Respondent's Rejoinder at 15 July 2020. Claimant also proposed to assess the need for a hearing after the Respondent's submission of the Rejoinder.

96. On 28 April 2020, the Sole Arbitrator granted Respondent an extension of time until 15 July 2020 to file the Rejoinder. In the same email, the Sole Arbitrator confirmed that, as a consequence of said extension of time, the hearing scheduled on 17-19 June 2020 was cancelled and that the need for a hearing, including the format and date of the same, would be determined in consultation with the Parties after the submission of the Rejoinder.

97. On 14 July 2020, Respondent filed its **Rejoinder** together with <u>Appendices A and B</u> and additional <u>Exhibits 1 to 7</u>.

98. On 17 July 2020, Claimant contended that Respondent's Rejoinder contained *"new elements"* that had not been raised in the Respondent's Statement of Defence and requested leave to submit a response by end of September 2020.

99. On 24 July 2020, Respondent confirmed that it did not object to Claimant's request for leave to submit a response to the Rejoinder by end of September 2020.

100. On 26 July 2020, the Sole Arbitrator confirmed that Claimant could file, by 30 September 2020, a submission in response to the Rejoinder. The Sole Arbitrator also confirmed that the next steps of the proceedings were reserved and would be determined after receipt of Claimant's submission.

101. On 30 September 2020, Claimant filed its **Reply to the Rejoinder** together with additional <u>Exhibit C-48</u>.

102. On 5 October 2020, the Sole Arbitrator invited the Parties to take position on the next steps of the proceedings, in particular to clarify whether the proceedings could be closed, or whether they would request a hearing or any other additional procedural activities before the closing of the proceedings.

103. On 12 October 2020, the Parties reverted to the Sole Arbitrator concerning the next steps of the proceedings. Neither Party requested further procedural activities.

104. On 21 October 2020, the Sole Arbitrator informed the Parties that he understood that the Parties did not request further procedural activities and that, accordingly, he would commence the preparation of the Final Award.

105. On 2 December 2020, the Sole Arbitrator invited the Parties to submit, by 9 December 2020, their Statements on Costs incurred in the second phase of the proceedings.

106. On 3 and 9 December 2020, the Parties submitted their **Statements on Costs**.

107. On 28 March 2019, 27 June 2019, 30 July 2019, 31 August 2020, 27 October 2020, 30 December 2020 and 21 January 2021, the ICC Secretariat informed the Sole Arbitrator and the Parties that the ICC Court, at its sessions of 7 March 2019, 6 June 2019, 4 July 2019, 6 August 2020, 1 October 2020, 3 December 2020 and 7 January 2021, respectively, had extended the time limit for the Final Award, ultimately to **26 February 2021**, pursuant to Article 30(2) ICC Rules.

108. On 23 December 2020, the Sole Arbitrator declared the proceedings closed pursuant to Article 27 ICC Rules.

## VII.   THE PARTIES' PRAYERS FOR RELIEF

### A.   CLAIMANT

109.   In its Request of 5 September 2017, Claimant made the following prayers for relief:

> *"4. Relief sought*
>
> 65.   *Claimant hereby respectfully requests the Arbitral Tribunal to:*
>
> *(i) Declare that Respondent is in breach of its obligations under the Contract to fully pay Claimant for the U308 delivery of June 2016;*
>
> *(ii) Declare that Respondent is in breach of its obligation under the Contract to purchase the remaining quantity of U308 to be delivered in 2016-2019;*
>
> *(iii) Declare that the Contract is avoided for the future;*
>
> *Consequently:*
>
> *(iv) Order Respondent to pay USD 3,556,862.48 to Claimant corresponding to the outstanding amount owed to UG for the U308 delivery of June 2016, together with delay interests;*
>
> *(v) Order Respondent to pay USD 61,443,137.52 to Claimant for the damages suffered due to the non-performance of its undertakings for the deliveries for the years 2016-2019;*
>
> *(vi) Order Respondent to bear all the costs of the present arbitration, including the fees and expenses of the Arbitral Tribunal, the ICC Court's administrative costs and expenses, and all of Claimant's legal fees, costs and expenses;*
>
> *(vii) Order provisional enforcement of the award, notwithstanding any recourse against it or against its enforcement in any local jurisdiction."*

110. In its Reply to the Rejoinder filed on 30 September 2020, Claimant stated the latest version of its prayers for relief as follows:

> "  **5. Relief sought**
>
> 32.  Claimant hereby respectfully requests the Arbitral Tribunal to:
>
> (i)  Declare that Respondent is in breach of its obligations under the U/N Contract to fully pay Claimant for the U308 delivery of June 2016;
>
> (ii)  Declare that Respondent is in breach of its obligation under the U/N Contract to purchase the remaining quantity of U308 to be delivered between 2016 and 2019;
>
> (iii)  Declare that the U/N Contract is avoided for the future;
>
> Consequently:
>
> (iv)  Order Respondent to pay USD 3,556,862.48 to Claimant corresponding to the outstanding amount owed to UG for the U308 delivery of June 2016;
>
> (v)  Order Respondent to pay delay interest at the contractual rate for the period going from 19 July 2016 to the date that the arbitral award is rendered, currently amounting to USD 495,197.49;
>
> (vi)  Order Respondent to pay USD 1,793,872.32 to Claimant for the damages suffered due to the non-performance of its undertakings for the deliveries for the years 2016-2019;
>
> (vii)  Dismiss the new claims made by Respondent in its Statement of Rejoinder;
>
> (viii)  Order Respondent to bear all the costs of the present arbitration, including the fees and expenses of the Arbitral Tribunal, the ICC Court's administrative costs and expenses, and all of Claimant's legal fees, costs and expenses;
>
> (ix)  Order provisional enforcement of the award, notwithstanding any recourse against it or against its enforcement in any local jurisdiction."

**B.**   **RESPONDENT**

111.  In its Answer of 4 December 2017, Respondent made the following prayers for relief:

> "**D.   RESPONDENT'S PRAYERS FOR RELIEF**
>
> 58.   *On the basis of the above, Respondent submits the following prayers for relief:*
>
> > *'The Arbitral Tribunal is respectfully requested:*
> >
> > 1.   *to dismiss Claimant's claims entirely;*
> >
> > 2.   *alternatively, in the event that Claimant's claims are granted, to order Dioxitek to pay to Respondent*
> >
> > > a.   *the entirety of any amount Respondent is ordered to pay to Claimant in this arbitration, and*
> > >
> > > b.   *any additional losses, costs and damages Respondent has suffered in light of Dioxitek's breach, including any additional loss due to non-performance of Dioxitek's undertakings for the deliveries for the years 2016-2019 and costs borne by Respondent in attempting to re-solve or settle the parties dispute prior to the arbitration, to be further specified in this arbitration; and*
> >
> > 3.   *to order Claimant to bear all costs of this arbitration, including but not limited to the fees and expenses of the Sole Arbitrator, the ICC Court's administrative costs and expenses, all of Respondent's legal fees, costs, and expenses, and internal handling and management costs and expenses;*
> >
> > 4.   *alternatively, in the event that Claimant's claims are granted, order Dioxitek to bear all costs of this arbitration, including but not limited to the fees and expenses of the Sole Arbitrator, the ICC Court's administrative costs and expenses, all of Respondent's legal fees, costs, and expenses, and internal handling and management costs and expenses.'*
>
> 59.   *Respondent expressly reserves its rights to supplement, extend, withdraw, amend or otherwise modify these prayers for relief in the course of the proceedings, subject to art. 23 (4) ICC Rules"*

112.   In its Rejoinder filed on 14 July 2020, Respondent stated the latest version of its prayers for relief as follows:

> *"CONCLUSION*
>
> *(…)*
>
> *Orano/UG profited $53.6 million from the complex chain deal (described in Appendix B) which could not have been done without UG's the intensive use of NYNCO's screening services. Therefore, it would be fair that NYNCO be awarded in relief 50% of that amount ($26.8 million) plus interest from the date UG filed the Arbitration (September 5, 2017), plus the difference between the three settlement payments NYNCO had planned to pay UG and the three settlement payments Dioxitek had planned to pay NYNCO resulting from the September 28, 2017 meeting in New York, plus all legal expenses NYNCO has suffered as a result of this arbitration plus interest"*

(page 7).

## VIII.  FACTS

### A.   INTRODUCTION

113.   The Sole Arbitrator provides below a summary of the main relevant facts as established based on the Parties' submissions and evidence produced in the arbitration. Additional facts may be set out, where relevant, in connection with the legal analysis in Section IX below.

114.   The factual summary below does not necessarily comprise all contentions put forward by the Parties. The Sole Arbitrator has, however, carefully examined and considered all submissions made by the Parties, even if certain contentions have not been expressly recited or referred to in this Award. Further, the Sole Arbitrator notes that the Parties have pleaded this case extensively and has not indicated in the award the facts that he considers irrelevant for the resolution of the dispute.

### B.   THE PARTIES, RELATED ENTITIES AND BACKGROUND

115.   Claimant is a German company active in the field of uranium trading (Request, § 3-5).

116.   Respondent is a company incorporated in the United States active in the field of uranium trading (Request for Joinder, § 7).

117.   Dioxitek is an Argentinian company that owns and operates a uranium dioxide plant in Argentina (Exhibit RJ-25).

118. The present dispute arises from the U/N Contract between Claimant and Respondent, which concerns the sale, by Claimant, and the purchase, by Respondent, of triuranium octoxide ("**U3O8**") destined for Dioxitek's plant in Argentina (Exhibit C-8).

## C.   THE NEGOTIATION OF THE U/N CONTRACT

119. In the period from October 2011 to March 2012, Claimant, Respondent and Dioxitek were in contact concerning potential supply of U3O8 to Dioxitek's plant in Argentina.

120. In October 2011, representatives of Claimant and Respondent exchanged emails concerning a joint trip to Argentina to meet with representatives of Dioxitek (Exhibits RJ-1, R-2 and R-3). Such joint trip took place in December 2011 (Respondent's First SoJ, § 31; Claimant's Second SoJ, § 45).

121. In January 2012, Dioxitek launched a tender for the supply of U3O8. Claimant and Respondent were among five potential suppliers to receive from Dioxitek requests for quotes (Exhibits RJ-2 and C-3).

122. In parallel with Dioxitek's tender, Respondent requested a quote for supply of U3O8 from Claimant (Exhibits C-4 and RJ-3).

123. Claimant hence received two requests for quotes for supply of U3O8, one from Dioxitek and one from Respondent. Both requests concerned approximately 940'000 tons U3O8 to Argentina over a five-year period from 2012 to 2016 (Exhibits C-3 and C-4).

124. On 16 and 17 January 2012, respectively, Claimant provided Respondent and Dioxitek with separate and different quotes for supply of U3O8 (Exhibits C-5, RJ-4 and C-6). Claimant notably offered Respondent supply of U3O8 at a *fixed price* (per lb) (Exhibits C-5 and RJ-4) and offered Dioxitek supply of U3O8 at a *variable price* (102% of market value plus transport costs) (Exhibit C-6).

125. Also on 17 January 2012, Respondent provided Dioxitek with its own quote for supply of U3O8 at a *fixed price* (per KgU) (Exhibit RJ-5). Such quote was later accepted by Dioxitek (see § 135 ff. below).

126. On 3 February 2012, Respondent accepted Claimant's quote for supply of U3O8 and asked Claimant to provide a draft contract *"as quickly as possible"* (Exhibit C-7).

127. One week later, on 10 February 2012, Claimant provided Respondent with a draft contract for sale and purchase of U3O8 (Exhibit R-6).

128. Between 10 February and 19 March 2012, Claimant and Respondent exchanged emails concerning the wording of certain provisions of the contract, in particular Article 5.3 relating to shipping documents prior to delivery and Article 6.1 relating to passing of title and risk at delivery and in respect of *"drums"* and *"Freight Containers"* (Exhibit R-7).

**D.    THE U/N CONTRACT**

129. On 19 and 21 March 2012, respectively, Respondent and Claimant signed the U/N Contract pursuant to which Claimant would *"sell and deliver"* and Respondent would *"purchase, take delivery of and pay"* for 940'000 kg U3O8 over a five year period from 2012 through 2016 (Exhibit C-8, in particular Article 1).

130. It follows from Article 4 of the U/N Contract that Claimant would sell U3O8 to Respondent for a fixed price *"per lb"* and that such price would gradually increase as follows:

> *"Delivery in May 2012:*          *USD 57.00 per lb U3O8*
>
> *Delivery in Sept/Oct 2012:*      *USD 58.00 per lb U3O8*
>
> *Delivery in 2013:*               *USD 60.00 per lb U3O8*
>
> *Delivery in 2014:*               *USD 63.00 per lb U3O8*
>
> *Delivery in 2015:*               *USD 66.00 per lb U3O8*
>
> *Delivery in 2016:*               *USD 69.00 per lb U3O8"*

(Exhibit C-8, p. 3).

131. The payment conditions are set out in Article 5 of the U/N Contract (Exhibit C-8, p. 4). This provision reads as follows in relevant parts:

> *"**Article 5:        Conditions of Payment***
>
> *5.1      Payment shall be effected 30 days after Delivery by wire transfer to Seller's bank account designated by Seller in the applicable invoice. (…)*
>
> *5.2      In case of late payment, interest will be payable at the rate of the London Interbank Offered Rate (LIBOR) as published by the British Banker's Association (BBA) plus two percentage points (2%) on any amount that is not paid by the due date. (…) Interest will be calculated on a pro-rata basis of a year of 365 days for the actual number of days in question."*

(Exhibit C-8, p. 4).

132. Article 2 of the U/N Contract originally foresaw the following schedule of six deliveries from 2012 through 2016:

> "• *100,000 kgU in U3O8 in May/June 2012*
>
> • *100,000 kgU in U3O8 in Sep/Oct 2012*
>
> • *150,000 kgU in U3O8 during 2013*
>
> • *150,000 kgU in U3O8 during 2014*
>
> • *220,000 kgU in U3O8 in during 2015*
>
> • *220,000 kgU in U3O8 during 2016*"

(Exhibit C-8, p. 2).

133. Pursuant to Article 2 of the U/N Contract, the U3O8 would be delivered to *"DAP Port of Buenos Aires"* in Argentina (Exhibit C-8, p. 2).

134. The U/N Contract contains a *force majeure* clause that reads as follows in relevant parts:

> "***Article 12:*** ***Force Majeure***
>
> 12.1 *Force Majeure shall mean any act or event beyond the reasonable control of the affected Party and not caused by the fault, negligence or lack of diligence of such Party, including but not limited to act of god, accident, fire, explosion, flood, mobilisation, war, foreign war, riot, civil commotion, rebellion, revolution, blockade, requirement, strike, regulation, restriction or other act or failure to act of any government or governments, whether legal or otherwise, act of public enemies, the elements, and including any failure or inability to perform due to claim of force majeure of any third party to comply with the instructions of either Party or such third party's agreement with either Party.*
>
> 12.2 *The obligations which are affected by Force Majeure shall be deemed suspended so long as any such causes or contingencies prevent or delay its execution. Neither Party shall be responsible for or liable because of any delay in or failure of the Seller to deliver or the Buyer to receive U308, where such delay or failure is due to any event of Force Majeure.*

> 12.3 *The Party whose obligations are suspended hereunder shall promptly furnish notice of such suspension, and the reason therefore, to the other Party and shall use reasonable efforts to eliminate the causes or contingencies producing the suspension and to avoid or minimise the consequence of such suspension, and shall continue with its obligations after the cause for such suspension has ceased to exist.*
>
> 12.4 *If any event of Force Majeure delays a delivery of U3O8 hereunder for a period of 180 (one hundred eighty) days beyond the date of issuance of the export license, either Party is entitled at its option and without further obligation to terminate the delivery under this Contract upon written notice to the other Party at any time while the Force Majeure lasts.*
>
> 12.5 *In the event of cancellation hereunder, neither Party shall be entitled to damages from the other Party on account of the cancellation of the Contract."*

(<u>Exhibit C-8</u>, p. 8-9).

### E.   RESPONDENT'S CONTRACT WITH DIOXITEK (THE **N/D CONTRACT**)

135. On 19 March and 12 April 2012, respectively, Respondent and Dioxitek signed a contract pursuant to which Respondent would *"sell and deliver"* and Dioxitek would *"purchase, take delivery of and pay"* for 940'000 kg U3O8 over a five year period from 2012 through 2016 ("**N/D Contract**") (<u>Exhibit RJ-6</u>, in particular Article 1, p. 2).

136. Like the U/N Contract, Article 2 of the N/D Contract foresaw six deliveries during the period from 2012 to 2016 to *"DAP Port of Buenos Aires"* (<u>Exhibit RJ-6</u>, p. 2) (see also § 132-133 above).

137. For the rest, the terms of the N/D Contract largely correspond to the terms of the U/N Contract, including the terms of the *force majeure* clause in Article 12, which are identical to the terms of the *force majeure* clause in Article 12 of the U/N Contract (<u>Exhibit RJ-6</u>, p. 9; compare with <u>Exhibit C-8</u>, p. 8-9 and § 134 above).

F.   THE AMENDMENTS TO THE U/N CONTRACT

138.   During the period from May 2012 to January 2016, the U/N Contract underwent six amendments (Exhibits C-11, C-18 to C-20 and C-22 to C-24).

139.   In particular, by virtue of *"Amendment No. 2"* of 18 January 2016, the Parties agreed on the schedule and the pricing for additional deliveries of U3O8 in 2017, 2018 and 2019 (Exhibit C-23).

140.   The delivery schedule and the pricing under Amendment No. 2 were as follows:

> *"Delivery Year 2016:*
> *Quantity: 170,000 kgU in U3O8 +/- 5%*
> *Delivery Year 2017:*
> *Quantity: 170,000 kgU in U308 +/- 5%*
> *Delivery Year 2018:*
> *Quantity: 170,000 kgU in U308 +/ 5%*
> *Delivery Year 2019:*
> *Quantity: 220,000 kgU in U308 +/- 5%*
>
> *(...)*
>
> *Delivery Year 2016: USD 42.40 / lb U3O8*
> *Delivery Year 2017: USD 53.30 / lb U3O8*
> *Delivery Year 2018: USD 55.70 / lb U3O8*
> *Delivery Year 2019: USD 56.40 / lb U308"*

(Exhibit C-23, p. 1).

141.   By virtue of a separate document of the same date, 18 January 2016, the Parties agreed that the 170 tons of U3O8 envisaged for delivery in 2016 be split into two equal shipments of 85 tons scheduled for June and December 2016, respectively (Exhibit C-24).

142.   The amendments of 18 January 2016 were mirrored by similar amendments to the N/D Contract between Respondent and Dioxitek (Exhibits RJ-14 and RJ-15).

G.   THE PERFORMANCE OF THE U/N CONTRACT FROM 2012 TO 2015

143.   The Parties agree that the U/N Contract, as amended, was performed in a satisfactory manner during the period from 2012 to 2015 (Request, § 18; SoC, § 29; Answer, § 22).

144.   The record shows that Claimant provided Respondent with an invoice in advance of each delivery of U3O8 and that the invoices were timely paid by Respondent (see, for instance, Exhibits C-9, C-10, C-12 to C-17 and C-21).

145. The record also shows that Claimant delivered the U3O8 directly to Dioxitek in Argentina (Respondent's First SoJ, § 54; Claimant's First SoJ, § 86; Dioxitek's First SoJ, § 51; see also Exhibit R-8).

### H.    DELAYS AND DIFFICULTIES IN SUMMER 2016

146. The circumstances leading to the dispute between the Parties first occurred in summer 2016.

147. In June 2016, as envisaged in the U/N Contract (as amended on 18 January 2016, see § 139-141 above), Claimant delivered approximately 87 tons U3O8 to Dioxitek in Argentina and invoiced Respondent USD 9'556'862.48 for such delivery (Exhibits C-25 and C-26).

148. On 23 June 2016, Dioxitek sent a letter to Respondent wherein it sought Respondent's *"attention"* to a *"difficult situation"* and *"huge economic difficulties"* caused by local authorities' closing of Dioxitek's plant in Argentina and wherein it requested that the delivery scheduled to be made under the N/D Contract in December 2016 be postponed (Exhibit C-31).

149. Dioxitek's letter to Respondent read as follows in relevant parts:

> *"I contact you in order to bring to your attention the difficult situation DIOXITEK S.A. is going through, hoping that exposing the reality as clearly as possible will give us the opportunity to take the appropriate decisions in order to avoid [causing] damage to [both] one and the other.*
>
> *DIOXITEK S.A. finds itself with its plant closed, for the past six months, by the Municipality of Cordoba, which prevents it from producing and thus selling. The problem with the Municipality originates from a provision on Soil Use whereby the factory shall be moved to another location; [this is the] reason why a new Plant is being built in the Formosa Province, with a progress of 3 0%, but this will take no less than three years between the works and the commissioning. In this context, it is worth noting that DIOXITEK will file within the next few days an amparo Request with the Justice that should allow to keep the plant open in order to continue producing, until the new [plant] in the Formosa province enters into service.*
>
> *In the face of huge economic difficulties that this situation is generating for the company, we [hereby] request that the cargo of 85 t of Uranium is not sent as planned, in December 2016."*

(Exhibit C-31.2).

150. On 24 June 2016, Respondent informed Claimant that, due to delay in payment to Respondent from Dioxitek under the N/D Contract, Respondent's payment to Claimant for the delivery the U/N Contract would be delayed (Exhibits C-28 and RJ-19; see also Exhibit RJ-18).

151. One week later, on 30 June 2016, Respondent requested that the delivery scheduled to be made under the U/N Contract in December 2016 be *"postponed until further notice"* (Exhibits C-29 and RJ-27).

152. Attached to Respondent's email to Claimant of 30 June 2016 was a copy of a letter dated 14 June 2016 from Dioxitek to Respondent whereby Dioxitek requested a similar halt in deliveries under the N/D Contract *"until further notice"* (Exhibit RJ-27, p. 2; see also Exhibit RJ-22).

153. On 11 July 2016, Claimant sent a letter to Respondent requesting *"further details and explanations"* concerning the reasons behind Respondent's request (Exhibit C-30). Claimant stated that, upon receipt of such explanations, it would *"evaluate the possibility to postpone this delivery"* (Exhibit C-30).

154. Shortly thereafter, Respondent forwarded to Claimant Dioxitek's letter of 23 June 2016 containing Dioxitek's explanations relating to the closing of its plant in Argentina and the ensuing *"difficult situation"* and *"huge economic difficulties"* (Exhibit C-31; § 148-149 above; see also Request, § 34).

155. Between July and September 2016, Respondent made three partial payments to Claimant amounting to a total of USD 6 million for the U3O8 delivered in June 2016 (Exhibit C-27). However, USD 3'556'862.48 remained outstanding under the invoice issued by Claimant to Respondent in June 2016 (Exhibit C-26; see also § 147 above).

### I.   THE AMENDED DELIVERY SCHEDULE OF 20 SEPTEMBER 2016

156. On 20 September 2016, with reference to *"discussions and letters exchanged since June 2016"*, Claimant informed Respondent that it would *"accept to defer"* the December 2016 delivery *"under certain conditions"* (Exhibit C-32).

157. The *"conditions"* posed by Claimant were, essentially, (i) that the December 2016 delivery be made by March 2017, (ii) that the price for the December 2016 delivery be increased and (iii) that the deliveries scheduled to be made in 2017 be maintained as originally envisaged (Exhibit C-32; see also Exhibit C-23 and § 139 above).

158. The Parties have not produced in this arbitration any written response from Respondent.

**J.     THE AMENDED DELIVERY SCHEDULE OF 21 DECEMBER 2016**

159.  On 24 November 2016, Dioxitek sent a letter to Respondent wherein it requested that the deliveries scheduled for 2016, 2017, 2018 and 2019 under the N/D Contract be postponed to 2018, 2019, 2020 and 2021, so that no further deliveries be made in 2016 and 2017 (Exhibit C-33).

160.  In its letter to Respondent, Dioxitek reiterated that it was in a *"difficult situation"* because municipal authorities had closed Dioxitek's plant in Argentina and prevented Dioxitek from producing and selling uranium dioxide (Exhibit C-33).

161.  On or about 24 November 2016, Respondent forwarded to Claimant a copy of Dioxitek's letter and requested a similar postponement of deliveries under the U/N Contract (Exhibit C-33; see also Exhibit C-34).

162.  On 21 December 2016, Claimant sent a letter to Respondent wherein it proposed an amended delivery schedule postponing the deliveries scheduled for 2016, 2017, 2018 and 2019 to 2017, 2018, 2019 and 2020 (Exhibit C-34).

163.  In essence, Claimant's proposal envisaged to maintain the deliveries scheduled to be made in 2017, but to defer the December 2016 delivery and part of the 2019 delivery to 2020 (Exhibit C-34).

164.  In its letter to Respondent, Claimant stressed that Respondent's *"repeated non-performance"* of *"annual offtake obligations"* was causing Claimant *"serious loss and damage"* and that Claimant *"cannot this time simply defer to your request"* (Exhibit C-34).

165.  The Parties have not produced in this arbitration any written response from Respondent.

**K.     THE AMENDED DELIVERY SCHEDULE OF 3 FEBRUARY 2017**

166.  Nine days later, on 30 December 2016, Dioxitek sent a letter directly to Claimant wherein it informed Claimant that it could not take delivery of U3O8 in 2017 as envisaged in the amended delivery schedule that Claimant had proposed to Respondent on 21 December 2016 (Exhibit C-35; see also Exhibit C-34 & § 162 above).

167.  In its letter to Claimant, Dioxitek stated that it would be *"impossible"* to take delivery in 2017 and that the *"only available course of action"* was to *"restart deliveries from 2018"* (Exhibit C-35).

168.  Dioxitek explained that it had obtained permission for *"immediate reopening of our plant"*, but stressed that *"a long period of recovery now begins"* (Exhibit C-36).

169. Dioxitek also stated that *"[a]s we resume normal activity and cash flow, it is our intention to pay our debt to UG for the deliveries already made in the shortest possible time"* (<u>Exhibit C-36</u>).

170. On 3 February 2017, Claimant reacted to Dioxitek's letter of 30 December 2016 by sending a letter to Respondent stressing, among other points, that *"the contractual relationship is between NYNCO Trading Ltd and Urangesellschaft GmbH"* (<u>Exhibit C-36</u>, p. 1).

171. Claimant also stated that, in order to find a *"solution ... agreeable to our companies"*, it would be willing to make a *"last effort"* and limit the delivery scheduled for 2017 to 85 tons U3O8 (<u>Exhibit C-36</u>, p. 1).

172. Claimant's proposed amended delivery schedule was as follows:

| UG's proposal of Feb 2, 2017 | |
|---|---|
| Quantity (t) | Price ($/lb) |
| 2016 | 85 | $42.40 |
| 2017 | 85 | $49.67 |
| 2018 | 170 | $55.70 |
| 2019 | 170 | $56.40 |
| 2020 | 170 | $58.10 |
| 2021 | 50 | $59.85 |

(<u>Exhibit C-36</u>, p. 2).

173. The Parties have not produced in this arbitration any written response from Respondent.

L.  DIOXITEK'S LETTER TO RESPONDENT OF 9 MAY 2017

174. Three months later, on 9 May 2017, Dioxitek sent a letter to Respondent informing Respondent that Dioxitek would not take further deliveries of U3O8 under the N/D Contract and that Dioxitek would not be in a position to pay to Respondent the outstanding amount for the U3O8 delivered in June 2016 (Exhibit C-37 / RJ-28, p. 1).

175. With reference to an *"extremely difficult context"*, Dioxitek *"offer[ed]"* Respondent to return the unpaid portion of the U3O8 delivered in June 2016 and to terminate the N/D Contract so as to *"release each other from any additional obligations or liabilities"* (Exhibit C-37 / RJ-28, p. 1-2).

176. The *"extremely difficult context"* described by Dioxitek not only related to Dioxitek's own *"precarious financial situation"*, but also concerned alleged *"irregularities" "exposed"* during an *"inquiry"* into the N/D Contract's negotiations (Exhibit C-37 / RJ-28, p. 2).

177. Dioxitek's letter to Respondent reads as follows in relevant parts:

> *"As the newly appointed President of the Company, I was mandated by CNEA (..:) to assess the Company's operational, commercial and financial situation. I have recently presented our findings to the relevant authorities.*
>
> *(…)*
>
> *As of May of 2017, the Company is, according to our findings, in a very precarious financial situation. Among other reasons beyond our control, the Company suffered a long stoppage of its plant resulting from the application of zoning regulations in Cordoba City, which stoppage gave rise to a severe shortage of the Company's working capital which now threatens the Company's viability going forward. Additionally, the commercial bond with our major client, Nucleoeléctrica Argentina S.A. ("NA-SA"), has been stressed by the prolonged shutdown and the Company's inability to comply with its delivery obligations. Moreover, since the manufacturer of NA-SA's fuel elements resorted to importing UO$_2$ at competitive prices, the government authorities have been prompted to review the future plans for Dioxitek.*
>
> *In this extremely difficult context, I have concluded that the Company's future purchases of U308 from the Seller, as described in clause 4(b),(c) and (d) of Amendment 3 to the Contract, are no longer possible in light of the precarious financial situation and the perilous commercial position in which we found the Company. In fact, I believe that the Company will not be even in a position to process nor pay the totality of the approximately 87 tons of U308 that were delivered in Buenos Aires in 2016 (the "2016 Shipment"). Accordingly, I am offering to return the unpaid portion of the 2016 Shipment to you at the location of your choosing, and to terminate the Contract and release each other from any additional obligations or liabilities.*

> *It is also important to note that our inquiry regarding the Contract's negotiation has exposed several irregularities. We are focusing in particular on a purchase of 100 tons of uranium (in excess of the agreed 940 tons) at prices that doubled the spot price at the time of such purchase. We are also examining the justifications for the extension of the Company's purchase obligations by virtue of Amendment 3, at prices that substantially exceeded those of the spot market. The latter deed, which occurred within days of a change of governmental authorities, was executed against the expressed opinion of the Company's internal auditing staff, as recorded in the relevant minutes of the board meeting. Needless to say, we would appreciate any information you could provide us to clarify the above mentioned dealings."*

(Exhibits C-37 and RJ-28).

178. Respondent forwarded Dioxitek's letter of 9 May 2017 to Claimant the following day, 10 May 2017 (Exhibit C-37).

## M.   CLAIMANT'S NOTICE OF 9 JUNE 2017

179. One month later, on 9 June 2017, Claimant sent a *"formal notice"* to Respondent wherein it requested that Respondent, within thirty days, pay to Claimant USD 65 million corresponding to Claimant's *"loss of revenue and loss of margin"* as well as the unpaid portion of the U3O8 delivered in June 2016 (the "**Notice**") (Exhibit C-38).

180. In the Notice, Claimant reacted to the contents of Dioxitek's letter to Respondent of 9 May 2017 that Respondent had forwarded to Claimant on 10 May 2017 (§ 174-178 above) and stressed that it disagreed with *"your client's position"* and considered that the mention of alleged regularities relating to the contract negotiations was *"inappropriate and unfair"* (Exhibit C-38, p. 1).

181. Claimant further underscored that it had made *"utmost efforts"* to *"conciliate"* Respondent's situation and that it was *"unpleasantly surprised"* by Dioxitek's statements of 9 May 2017 (Exhibit C-38, p.1).

182. The Notice read as follows in relevant parts:

> *"Reference is made to the latest correspondence dated May 9, 2017 from your client Dioxitek (…).*
>
> *In this letter, your client, Dioxitek after reminding again Nynco with its financial and precarious situation due mainly to the stoppage of its plant and its difficulty to comply with its delivery obligations, sets out its position and intents regarding the above mentioned Contract, summarized as follows:*
>
> *- Inability to pay the totality of the 87,000 kgU of U3O8 delivered in 2016;*
> *- Return of 2016 unpaid portion submitting the choice of location: and*
> *- Termination of the Contract with release of any additional obligations/liabilities.*

*Several times since February 2015 and even though our unique client is Nynco and not Dioxitek, Urangesellschaft has accepted to deviate from the initial Contract signed in 2012 and conceded to amend it twice on the delivery and pricing terms, and consent on adjustments so as to comprehensively take into consideration your client's difficulties. In this context and as a matter of fact, we are unpleasantly surprised by the statement of your client Dioxitek, implying irregularities linked to the amendments conceded to the Contract, as the additional quantities agreed between our two companies have to be seen in regards to the price reduction of 2016 subscribed quantity accepted by Urangesellschaft. Consequently, we can only disagree with your client's position and its reference to alleged irregularities regarding Contract's amendment negotiation is inappropriate and unfair.*

*Since the beginning of our contractual relationship with Nynco, and even more since the signing of those amendments to take into account Dioxitek's situation and requests as reported to us, Urangesellschaft has made its utmost efforts to conciliate its position and business commitments with your situation.*

*Nevertheless, today, despite the arranging measures Urangesellschaft accepted to take as set forth above, Nynco is unfortunately still not in a position to comply with its current contractual obligations - past 2016 unpaid deliveries and execution of the remaining ones. We therefore need to break this deadlock situation as both our companies are suffering from this situation.*

*We can confirm that the default by Nynco to execute our Contract and its amendments is definitely causing Urangesellschaft a serious prejudice, including but not limited to loss of revenue and loss of margin. Thus, in order to release Nynco from its contractual obligations, Urangesellschaft is claiming Nynco the payment of $65M ($65,000,000) representing those abovementioned losses, the unpaid portion of 2016 delivery and also the highest necessity for Urangesellschaft to sell the U3O8 from the cancelled deliveries of our Contract to another party to be found, but not at prices as concluded per our Contract, and merely at most prices related to current market price.*

***We inform NYNCO that this letter is a formal notice and to this end, we, hereby, require NYNCO to undertake the payment of this amount within thirty (30) days from the date of this present letter by wire transfer in US dollars, which will lead to the release all commitments of both our companies to the Contract and its amendments"***

(Exhibit C-38, emphasis in original).

183. The Parties have not produced in this arbitration any written response from Respondent.

**N.   CLAIMANT'S TERMINATION LETTER OF 1 SEPTEMBER 2017**

184.   Three months later, on 1 September 2017, Claimant sent to Respondent a *"notice of failure to reach an amicable agreement"* (Exhibit C-40).

185.   Claimant stated that Respondent had not *"provided any satisfactory answer"* to the Notice of 9 June 2017 and declared that it *"consider[ed] that the Contract is avoided for the future"* (Exhibit C-40).

186.   Claimant's termination letter of 1 September 2017 reads as follows in relevant parts:

> *"**FORMAL NOTICE**
>
> (...)*
>
> *We revert to you in the above referenced matter further to UG's formal notice dated 9 June 2017 in which it required Nynco to undertake the payment of $ 65,000,000 within thirty days, corresponding to the prejudice caused by Nynco's breaches of its obligations to pay for the U308 delivered in June 2016 and refusal to honour its undertaking to purchase the quantities of U308 to be delivered between December 2016 and 2019 as per Amendment n°2 to the Contract dated 18 January 2016.*
>
> *UG's letter dated 9 June 2017 was sent following several attempts made by UG to accommodate Nynco and find an amicable settlement (see e.g. UG's letters dated 21 December 2016 and 3 February 2017).*
>
> *However, these attempts have failed and Nynco has not provided any satisfactory answer to the formal notice dated 9 June 2017.*
>
> *UG therefore considers that the Contract is avoided for the future and hereby declares that no agreement could be reached with Nynco within a reasonable timeframe, in accordance with Article 16 of the Contract. "*

(Exhibit C-40, emphasis in original).

187.   The Parties have not produced in this arbitration any written response from Respondent.


**O.   CLAIMANT'S REQUEST FOR ARBITRATION OF 5 SEPTEMBER 2017**

188.   On 5 September 2017, Claimant filed the Request against Respondent that initiated the present proceedings (see § 12 above).

**P.    THE PAYMENT SCHEDULE OF 28 SEPTEMBER 2017**

189.  In the end of September 2017, representatives of Claimant, Respondent and Dioxitek held several meetings in New York. According to an agenda circulated on 25 September 2017, the purpose of the meetings was to discuss *"each party's position/situation (notably Nynco's final client and the agenda related to the shutdown/re-opening of the plant)"* (Exhibit R-22).

190.  On 28 September 2017, Claimant and Respondent signed a payment schedule for the *"delivery made on June 16, 2016"* (the "**Payment Schedule**") (Exhibit RJ-30).

191.  The Payment Schedule envisaged that the outstanding amount for the delivery made in June 2016, including interest accrued since 18 June 2016, be paid in three instalments in December 2017, March 2018 and June 2018, respectively (Exhibit RJ-30).

192.  The Payment Schedule read as follows:

> *"Payment schedule for delivery made on June 16, 2016 under Contract to sell uranium concentrates between NTL and UG.*
>
> *December 20, 2017 - [Redacted] plus accrued interest on the unpaid balance from June 18, 2016 according to Article 5.2 of the Agreement.*
>
> *March 20, 2018 - [Redacted] plus accrued interest on the unpaid balance from June 18, 2016 according to Article 5.2 of the Agreement.*
>
> *June 20, 2018 - [Redacted] plus accrued interest on the unpaid balance from June 18, 2016 according to Article 5.2 of the Agreement."*

(Exhibit RJ-30).

193.  On the same day, 28 September 2017, Respondent and Dioxitek signed a similar payment schedule for outstanding amount due for the delivery made in June 2016 under the N/D Contract (Exhibit RJ-29).

## IX.   ASSESSMENT OF THE FACTS AND LEGAL ANALYSIS

### A.   INTRODUCTION

194.  In this section, the Sole Arbitrator will assess the facts and address the legal arguments of the Parties.

195.  The summaries of the Parties' positions do not necessarily comprise all arguments put forward by the Parties. The Sole Arbitrator has, however, carefully examined and considered all submissions made by the Parties, even if certain arguments have not been expressly recited or dealt with in this Final Award.

### B.   APPLICABLE LEGAL FRAMEWORK

196.  The Parties have not expressed opposite views concerning the legal framework applicable to the dispute. In particular, Respondent has not objected to Claimant's reliance on the United Nations Convention on Contracts for the International Sale of Goods ("**CISG**") (SoC, § 71).

197.  For sake of completeness, the Sole Arbitrator confirms that Article 16 of the U/N Contract provides that the present dispute is governed by *"the substantive law of Switzerland"* (Exhibit C-8, p. 11) which includes the CISG that applies to contracts for the international sale of goods.[1]

### C.   DEFENCES INVOKED BY RESPONDENT

### *1)   Introduction*

198.  Before turning to the Parties' specific claims in this arbitration, the Sole Arbitrator will examine Respondent's defences and explanations relating to excuses for non-performance of the U/N Contract.

199.  In particular, the Sole Arbitrator will address Respondent's defences that it was exempt from its obligations towards Claimant under the U/N Contract due to *force majeure* (Answer, § 38-44 and 52-53) and in view of the nature of the contractual relationship (SoD, p. 1-2; Rejoinder, p. 2-3, Appendix A).

---

[1] The CISG entered into force in Switzerland on 1 March 1991 (RS 0.221.211.1).

*2)*   ***Respondent's position***

   *i)*   *Force majeure*

200.   Respondent does not dispute that it failed to pay for the entirety of the U3O8 delivered in June 2016, that it failed to take delivery of U3O8 for the years 2016 to 2019 or that such failures could potentially constitute breaches of the U/N Contract (see, in particular, Answer, § 34-44 and § 290-294 and 324-328 below). Respondent submits that it was exempt from its obligations towards Claimant under Article 12.1 and 12.2 of the U/N Contract due to *force majeure* caused by *"dramatically changed circumstances"* (Answer, § 52).

201.   The *force majeure* events invoked by Respondent relate to the shutdown of Dioxitek's plant in Argentina in the beginning of 2016 which prevented Dioxitek from *"generating the necessary cash flow ... to make payment to Respondent"* (Answer, § 41, referring to Exhibit C-31).

202.   Respondent asserts that, *"[a]s a result"* of Dioxitek's default under the N/D Contract, Respondent *"could not pay"* Claimant for the U3O8 delivered in June 2016 *"or continue to buy"* U3O8 from Claimant (SoD, p. 2).

203.   According to Respondent, *"force majeure events faced by Dioxitek"* amounted to *force majeure* events under Article 12.1 and 12.2 of the *"Contracts"* and hence suspended Respondent's obligations under the U/N Contract (Answer, § 44).

204.   Respondent also states that the re-opening of Dioxitek's plant in end of 2016 was *"not sufficiently timely"* to prevent the *"breakdown of the Parties' trilateral arrangement"* because the shutdown placed Dioxitek in a *"precarious financial situation"* (Answer, § 43, referring to Exhibit C-35).

205.   Respondent hence argues that, in view of the situation caused by the shutdown of Dioxitek's plant in Argentina, Respondent's obligations were *"suspended"* until Claimant's termination of the U/N Contract on 1 September 2017 (Exhibit C-40) (Answer, § 53). Respondent further states that, under Art. 12.5 of the U/N Contract, Claimant is not entitled to any damages (Answer, § 53).

   *ii)*   *Nature of the contractual relationship (the U/N Contract as a "screen")*

206.   As noted above (§ 200), Respondent does not dispute that it failed to pay for the entirety of the U3O8 delivered in June 2016, that it failed to take delivery of U3O8 for the years 2016 to 2019 or that such failures could potentially constitute breaches of the U/N Contract (see, in particular, Answer, § 34-44 and § 290-294 and 324-328 below). Respondent submits that, in view of the nature of the contractual relationship (the U/N Contract as a *"screen"*), it was exempted from its obligations towards Claimant (SoD, p. 1-2; Rejoinder, p. 2-3 and Appendix A).

207. Respondent explain that its role was only to *"connect parties having uranium to parties needing uranium"* (SoD, p. 1). It further states that *"[s]ometimes buyers and sellers prefer to enter into an agreement with NYNCO in the middle rather than having a contract directly with each other"* and that *"[t]his was the case with the UG/Dioxitek deal"* (SoD, p. 1-2).

208. Respondent also contends that *"NYNCO always kept UG promptly informed of the details and NYNCO and UG cooperated with each other to solve the problems"* and that Claimant was in particular *"well aware that the ultimate buyer was Dioxitek"* (SoD, p. 2).

209. In its Rejoinder, Respondent has provided additional explanations concerning the nature of the transaction under the U/N Contract and its own role as a *"screen"* as opposed to a *"sleeve"* (Rejoinder, p. 3, and Appendix A, p. 2).

210. In particular, Appendix A to the Rejoinder details the differences, according to Respondent, between a *"Sleeve Transaction"* and a *"Screening Transaction"*. Respondent states in particular the following in this Appendix A:

> *"Sleeves are used when the risk managers of U3O8 Sellers determine the creditworthiness of a U3O8 Buyer is unacceptable. A Trader can "sleeve" the U3O8 Seller, that is substitute its financial strength for that of the U3O8 Buyer.*
>
> *(…)*
>
> *In such a sleeve transaction, the Trader has first performed a credit analysis on the U3O8 Buyer and found it acceptable to him.*
>
> *In such a sleeve transaction the U3O8 Seller is not concerned about the performance of the U3O8 Buyer or the financial health of the U3O8 Buyer. The U3O8 Seller looks to only the Sleeving Trader. The timing of deliveries does not have to match because the Trader often has its own inventory of U3O8 and its own sources of funds. The Trader usually uses its own contract with each counterparty and is not limited to back-to back contracts, so timing is very flexible. (…)*
>
> *The Sleeving Trader takes the full risk. If there is a problem, the U3O8 Seller only deals with the Sleeving Trader, which it has pre-determined to be a strong financial company. Sleeves are used in spot and long-term deals. (…)*
>
> *NYNCO is not qualified to do a sleeve and has always made that clear to every market participant. NYNCO has never done a Sleeve Transaction and never will.*
>
> *NYNCO has never been asked to produce financials for any credit department analysis because NYNCO tells all participants NYNCO's credit is based only on the experience and honesty of the principals and not on financial strength because NYNCO has no financial strength. Neither UG nor its parent companies Cogema, Areva, NewCo or Orano have ever asked NYNCO for a financial statement.*
>
> *(…)*

*Screens are often done when the U3O8 Seller wants to keep its identity confidential for commercial and/or political reasons or does not want a direct contractual relationship for some reason. Sometimes all parties are known to each other.*

*(...)*

*In such a screening transaction, the U3O8 Seller has first performed a credit analysis on the U3O8 Buyer and found it acceptable to him.*

*In a screening transaction, the Trader uses the contract of the U3O8 Seller and then back-to-backs it with the U3O8 Buyer, because it is critical the material and money flows match.*

*The timing of deliveries to and from the Screening Trader must match because the Screening Trader does not have its own inventory of U3O8. The timing of the cash flows must closely match because the Screening Trader does not have its own source of cash. (...)*

*The U3O8 Buyer takes the risk of the performance of the U3O8 Seller. If there is a problem, it is understood that the U3O8 Seller will cooperate with the screening Trader who has the direct contract with the U3O8 buyer. Therefore, screen transactions always use "back to back" contracts the extent possible. Screens are used in spot and long-term deals. (...)*

*NYNCO only does screens.*

*NYNCO has never been asked to produce financials for any credit department analysis because in all its deals, the credit of NYNCO is irrelevant."*

211. In summary, Respondent considers that it acted as a *"screen"* and that, under such mechanism, there are *"back to back contracts"* and *"[i]f there is a problem, it is understood that the U308 Seller will cooperate with the screening Trader who has a direct contract with the U308 buyer"*. Respondent stresses that Claimant at all times had been aware of the fact that Respondent was a *"small company"* with *"little assets"* that *"could not possibly be relied upon to perform in the event that Dioxitek did not perform"* (Rejoinder, p. 3).

212. Respondent also states that these screen transactions date back in time since Cogema, already in 1986, *"asked Mr Einbund and Mr McCourt to do a screen transaction so Cogema's identity could be kept confidential from a counterparty"* (Rejoinder, p. 2).

213. Respondent further contends that *"NYNCO successfully screened Cogema's, Areva's and UG's identity in scores of transaction"* and that *"[t]he understanding had not changed over the decades : If there was a problem with a screening deal, the French would work with NYNCO in good faith to fix the problem"* (Rejoinder, p. 3).

214. Respondent further states that *"NYNCO relied on the French to back up and protect NYNCO and work with NYNCO to fix any problem"* (Rejoinder, p. 3).

215. Respondent explains that Claimant's attitude in the present case is a result of the WikiLeaks disclosures concerning the *"Uranium-gate"*, which notably exposed the *"uranium adventures in Africa"* of Claimant's parent company (Areva) and which was a *"scandal in France"* (Rejoinder, p. 2-3).

216. According to Respondent, *"[d]eviating from 30 years of working together on mutually beneficial screening transactions UG turned against NYNCO to distance itself and its parent Orano from any third world uranium transactions in reaction to WikiLeaks disclosures and Uranium-gate"* (Rejoinder, p. 3).

### 3) Claimant's position

#### i) Force majeure

217. Claimant presents three lines of arguments in support of its position that Respondent cannot avail itself of the *force majeure* exemption set out in Article 12.1 and 12.2 of the U/N Contract (SoC, § 90 and 111-112).

218. First, Claimant submits that the reference to *"failure or inability to perform due to claim of force majeure of any third party"* in Article 12.1 of the U/N Contract would not cover default in payments to Respondent by Dioxitek under the N/D Contract (SoC, § 91-99).

219. In particular, Claimant states that said reference in Article 12.1 of the U/N Contract must *"evidently"* be understood as a reference to third parties *"whose lack of performance materially hinders performance by a party to the U/N Contract"*, such as *"subcontractors or suppliers"* (SoC, § 92).

220. According to Claimant, this interpretation corresponds to the principles set out in Article 79 CISG and the ICC Force Majeure Clause 2003 (Exhibit CL-28) (SoC, § 93-94).

221. Claimant also states that the reference to *"any third party"* in Article 12.1 of the U/N Contract *"such as subcontractors and suppliers"* was *"likely not written to protect NYNCO but to protect Claimant from the potential force majeure of its own supplier"* (SoC, § 92 and 98).

222. Claimant also states that *"the identical drafting of Article 12.1 of the N/D Contract was likely meant to protect NYNCO from the impossibility to deliver the U308 to Dioxitek because of a potential force majeure of its supplier, Claimant"* (SoC, § 98).

223. Claimant adds that, if the Parties had intended to exempt Respondent from liability in case of default by Dioxitek, they would have included a provision in that regard in the U/N Contract (SoC, § 97).

224. Claimant also stresses that Respondent's argument that the U/N Contract and the N/D Contract were *"legally linked"* to each other was dismissed by the Sole Arbitrator in the Partial Award (SoC, § 91).

225. <u>Second</u>, Claimant submits that Respondent has failed to demonstrate its *"own inability to perform"* (SoC, § 100-113).

226. In particular, Claimant states that Respondent has failed to show that it was prevented from paying for the 2016 delivery of U3O8 and that it was prevented from taking delivery of U3O8 from December 2016 until 2019 (SoC, § 104).

227. Claimant stresses that, under Article 79 CISG, a buyer can be temporarily released from its obligations to pay the seller only in *"very special circumstances"* which would *"not include liquidity issues"* (SoC, § 105).

228. Claimant also underscores that the *"mere fact"* that Respondent was not paid by Dioxitek did not *"in itself"* prevent Respondent from paying Claimant. Similarly, Claimant states that Dioxitek's failure to buy U3O8 from Respondent did not prevent Respondent from purchasing U3O8 from Claimant (SoC, § 108).

229. Accordingly, Claimant considers that the conditions set in Article 12 of the U/N Contract are not met and that Respondent is not exempted from liability *vis-à-vis* Claimant (SoC, § 110).

230. <u>Third</u>, Claimant submits that Respondent failed to provide Claimant with a *"reasoned notice"* of suspension of performance and hence failed to comply with Article 12.3 of the U/N Contract (SoC, § 111-112).

231. According to Claimant, such failure to properly notify pursuant to Article 12.3 of the U/N Contract entails that Respondent *"cannot validly invoke the force majeure clause in Article 12.1 of the U/N Contract"* (SoC, § 113).

*ii)    Nature of the contractual relationship (the U/N Contract as a "screen")*

232. Claimant disputes the depiction made by Respondent of the situation (Reply, § 5) and submits that Respondent *"mischaracterises"* the U/N Contract (Reply to the Rejoinder, § 4). In particular, Claimant states that it *"always communicated with NYNCO, as its co-contractor, and not with Dioxitek"* (Reply, § 5).

233. Claimant also states that Respondent's arguments are *"not relevant"* because they have *"already been invoked and dismissed in the jurisdictional phase of these arbitration"* (Reply, § 5).

234. Claimant considers that Respondent's arguments are *"in total disregard of the Partial Award on Jurisdiction"* (Reply, § 5).

235. Claimant disputes the legal relevance of the distinction made by Respondent between *"screen"* and *"sleeve"* transaction. It states that this characterization is *"deprived of any legal ground"* and that the distinction *"does not exist from a legal point of view"* (Reply to Rejoinder, § 6).

236. According to Claimant, the *"sleeve"* transaction is *"nothing but a standard back to back contract whereby three parties sign two distinct sales contracts"* and the *"screen"* transactions *"do not exist from a legal point of view"* (Reply to Rejoinder, § 7 and 8).

237. Claimant stresses that it entered into a sales contract with Respondent and disputes that it assumed any risks associated with the transaction between Respondent and Dioxitek under the N/D Contract (Reply to the Rejoinder, § 9).

238. In this respect, Claimant also states that, in another *"unrelated"* contract between the Parties, the Parties expressly provided that Respondent's performance *"could be conditional"* upon transactions with suppliers and stresses that said contractual scheme was *"clearly different"* from the U/N Contract *"which does not contain such a protection"* for Respondent (Reply to the Rejoinder, § 9, referring to <u>Exhibit C-48</u>).

### 4)   **The Sole Arbitrator's determinations**

#### i)   *Force majeure*

239. Respondent relies on the *force majeure* clause set out in Article 12 of the U/N Contract and submits that its obligations were suspended from June 2016 until Claimant's termination of the U/N Contract on 1 September 2017 (see § 200-205 above). Claimant disputes that the circumstances invoked by Respondent would qualify for exemption under said clause (see § 217-231 above). The interpretation of the *force majeure* clause set out in Article 12 of the U/N Contract is hence key to Respondent's defence. The issue to be determined in this Final Award is whether the conditions for exemption from performance for *force majeure* as set out in Article 12 of the U/N Contract are met.

240. In the CISG, the principles governing contractual interpretation are set out in Article 8. This provision reads as follows:

> *"Article 8*
>
> *(1) For the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was.*
>
> *(2) If the preceding paragraph is not applicable, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.*
>
> *(3) In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties."*

241. It follows from the hierarchy set out in Article 8 CISG that the starting point of contractual interpretation is to determine the *real and common intention* of the parties (Article 8(1) CISG).

242. If the parties' true intentions cannot be established, Article 8(2) CISG provides for an *objective* and normative analysis of the *"understanding that a reasonable person of the same kind as the other party would have had in the same circumstances"*.

243. Such two-step approach giving priority to the subjective analysis of the intentions of the parties largely corresponds to the system under Swiss law (C. Brunner, Article 8 [Interpretation of Statements or Other Conduct of a Party], *in:* C. Brunner/B. Gottlieb (eds), Commentary on the UN Sales Law (CISG), Kluwer Law International 2019, N 2; compare Article 18(1) CO and P. Tercier/P. Pichonnaz, Le droit des obligations, 6. ed. 2019, N 1017 ff.).

244. However, in view of the second phrase of Article 8(1) CISG which limits a party's reliance on true intent to what *"the other party knew or could not have been unaware"*, the distinction between the subjective and the objective analyses is more delicate under the CISG (see also C. Brunner, *op. cit.*, N 6).

245. Pursuant to Article 8(3) CISG, both the subjective and the objective analysis shall be made with due regard to *"all relevant circumstances"* including *"the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties"*. These elements are not exhaustive and key factors to take into account include the wording of the contract and the principle of good faith (see also C. Brunner, *op. cit.*, N 13 ff. and references therein). Where the contract is in writing, the wording of the disputed clause is the starting point of the interpretation analysis (C. Brunner, *op. cit.*, N 14).

246. In the present case, the Parties disagree on the meaning of the *force majeure* provision of Article 12 of the U/N Contract.

247. This provision reads as follows :

> *"**Article 12:    Force Majeure**
>
> 12.1    Force Majeure shall mean any act or event beyond the reasonable control of the affected Party and not caused by the fault, negligence or lack of diligence of such Party, including but not limited to act of god, accident, fire, explosion, flood, mobilisation, war, foreign war, riot, civil commotion, rebellion, revolution, blockade, requirement, strike, regulation, restriction or other act or failure to act of any government or governments, whether legal or otherwise, act of public enemies, the elements, and including any failure or inability to perform due to claim of force majeure of any third party to comply with the instructions of either Party or such third party's agreement with either Party.*

12.2    *The obligations which are affected by Force Majeure shall be deemed suspended so long as any such causes or contingencies prevent or delay its execution. Neither Party shall be responsible for or liable because of any delay in or failure of the Seller to deliver or the Buyer to receive U308, where such delay or failure is due to any event of Force Majeure.*

12.3    *The Party whose obligations are suspended hereunder shall promptly furnish notice of such suspension, and the reason therefore, to the other Party and shall use reasonable efforts to eliminate the causes or contingencies producing the suspension and to avoid or minimise the consequence of such suspension, and shall continue with its obligations after the cause for such suspension has ceased to exist.*

12.4    *If any event of Force Majeure delays a delivery of U3O8 hereunder for a period of 180 (one hundred eighty) days beyond the date of issuance of the export license, either Party is entitled at its option and without further obligation to terminate the delivery under this Contract upon written notice to the other Party at any time while the Force Majeure lasts.*

12.5    *In the event of cancellation hereunder, neither Party shall be entitled to damages from the other Party on account of the cancellation of the Contract.*

        *Any termination pursuant to this Article 12 shall not affect any prior obligations or claim on the part of either Party to or against the other Party of this Contract."*

(Exhibit C-8, p. 8-9).

248.  The Parties have not produced drafts exchanged between the Parties that would reveal the changes, if any, made to this *force majeure* provision in the course of the negotiations (SoC, § 91-99; Answer, § 38-44; see also Respondent's Submission on Jurisdiction, § 38-40, Exhibits R-6 and R-7 and § 128 above). Further, they have not presented any witness on the issue of the Parties' real and common intention related to the circumstances of a *force majeure* event.

249.  Under such circumstances, the Sole Arbitrator does not find that he is in a position to establish the real and common intention of the Parties concerning the *force majeure* provision of Article 12 of the U/N Contract. Accordingly, the Sole Arbitrator will interpret the disputed provision from the perspective of the understanding that *"a reasonable person of the same kind as the other party would have had in the same circumstances"* pursuant to the principles of Art. 8(2) CISG.

250.  In its submissions, Respondent has focused on circumstances relating to its buyer, Dioxitek. Respondent alleged that the *"troubling situation"* in which Dioxitek found itself due to the unexpected shutting down of it Cordoba Plant *"prevented Dioxitek from generating the necessary cash flow in order to make payment to Respondent"* (Answer, § 41).

251.  Respondent considers that the alleged *force majeure* situation of Dioxitek is in itself a *force majeure* event that Respondent can invoke *vis-à-vis* Claimant. In particular, Respondent has asserted that *"force majeure events faced by Dioxitek"* amounted to *force majeure* events under the *"Contracts"* (being the U/N and the N/D Contracts, see Answer, § 10).

252.  Respondent's position on *force majeure* appears to be predicated on the idea that the U/N Contract and the N/D Contract formed a *"trilateral relationship"* between Claimant, Respondent and Dioxitek (Answer, § 11 ff.).

253.  The relationship between the U/N Contract and the N/D Contract was assessed in the Partial Award on Jurisdiction of 18 April 2019.

254.  In the Partial Award, the Sole Arbitrator found, in particular, that the two Contracts are not *"interconnected"* (§ 241), that the analysis of the facts do not reveal an intention of the Parties (and of Dioxitek) to enter into a *"trilateral"* relationship forming *"one economic transaction"* (§ 245), that the facts (including the two most important documents, namely the Contracts) confirm that there were two separate contractual relationships (§ 245), that Respondent was a buyer under the U/N Contract and a (re)seller under the N/D Contract and not a commission agent for Claimant and/or the Additional party (Dioxitek) (§ 257), and that the two Contracts hence constitute a *"chain of contracts"* as opposed to *"one unique transaction"* (§ 258).

255.  The abovementioned findings were made for the purposes of determining the jurisdiction of the Sole Arbitrator over Dioxitek (which was denied in the Partial Award). The Sole Arbitrator has however no reason to depart from his previous findings. In particular and as will be further discussed below (§ 278-287), Respondent has not established in the phase on the merits following the issuance of the Partial Award that the U/N Contract and the N/D Contract would constitute a trilateral relationship and would not be two separate contractual relationships. It may be added that the Partial Award was not challenged before the Swiss Federal Tribunal (*i.e.* the supervising court in Switzerland).

256.  The Sole Arbitrator will hence conduct its analysis of the merits of the dispute on the basis of the previous findings recalled above (§ 254) and, in particular, will analyse the *force majeure* situation based on the premise the U/N Contract and the N/D Contract are two separate contractual relationships.

257.  For this reason, the alleged *force majeure* situation of Dioxitek cannot in itself constitute a *force majeure* event that Respondent can invoke *vis-à-vis* Claimant.

258. In order to successfully invoke a *force majeure* event vis-à-vis Claimant, Respondent must show that the alleged impediments to perform fall within the scope of the notion of *force majeure* under the U/N Contract. This issue leads to the analysis of Article 12.1 of the U/N Contract.

259. Article 12.1 of the U/N Contract defines the notion of *force majeure* as *"any act or event beyond the reasonable control of the affected party and not caused by the fault, negligence or lack of diligence of such Party"*. Such *"act or event"* must prevent or delay the performance of the contractual obligations (see Article 12.2 of the U/N Contract).

260. Article 12.1 of the U/N Contract provides a non-exhaustive list of examples of *force majeure* events. Some are usual and typical of *force majeure* situations (*"act of god, accident, fire, explosion, flood, mobilisation, war …"* etc.). The end of the provision is less usual in that it includes *"any failure or inability to perform due to claim of force majeure of any third party to comply with the instructions of either Party or such third party's agreement with either Party"*.

261. The meaning of this last part of Article 12.1 of the U/N Contract is not clear. Respondent has not discussed this issue specifically. Claimant stated that this part must be understood *"as a reference to third parties whose lack of performance materially hinders performance by a party to the U/N Contract, such as subcontractors and suppliers"* (SoC, § 92); this part was thus *"likely not written to protect NYNCO but to protect Claimant from the potential force majeure of its own supplier"* (SoC, § 98) and *"the identical drafting of Article 12.1 of the N/D Contract was likely meant to protect NYNCO from the impossibility to deliver the U308 to Dioxitek because of a potential force majeure of its supplier, Claimant"* (SoC, § 98).

262. The Sole Arbitrator does not consider that the last part of Article 12.1 of the U/N Contract is limited to suppliers. However, he agrees with Claimant that the lack of performance by the third party must prevent the party to the U/N Contract from performing its contractual obligations. Any other interpretation would be at odds with the very notion of *force majeure* and would not be the understanding that *"a reasonable person"* would have.

263. In addition, the lack of performance of the third party is limited to situations where the third party can itself invoke a *force majeure* event (*"any failure or inability to perform due to claim of force majeure of any third party…"*, Article 12.1 of the U/N Contract). From a purely literal perspective, the provision could suggest that a mere *"claim"* of *force majeure* by the third party would be sufficient and would meet the requirement of the last part of Article 12.1 of the U/N Contract (irrespective as to whether the third party is *effectively* affected by *force majeure* events).

264. The Sole Arbitrator considers, however, that such purely literal interpretation cannot be the correct reading of this part of Article 12.1 of the U/N Contract. It would be unreasonable to hold that, if the third party raises an empty and spurious *"force majeure claim"* in order to excuse its performance *vis-à-vis* one of the party to the U/N Contract, such party could then avail itself of the same empty and spurious claim in order to excuse its own performance *vis-à-vis* the other party to the U/N Contract. It is only if the *force majeure* claim of the third party is *justified* and based on established events of *force majeure* that the party to the U/N Contract can raise it with a view to excusing its own performance. Any other interpretation would not be the understanding that *"a reasonable person"* would have, in particular in view of the fact that the notion of *force majeure* is an exceptional means of defence based on extraordinary circumstances (see also C. Brunner, Article 79 [Impediment Excusing a Party From Damages], *in:* C. Brunner/B. Gottlieb (eds), Commentary on the UN Sales Law (CISG), Kluwer Law International 2019, <u>Exhibit CL-32</u>, N 1).

265. In view of the above, the Sole Arbitrator considers that the *force majeure* defence based on any failure or inability to perform due to claim of *force majeure* of any third party requires two cumulative elements: i) the Party must establish that the third party was in a situation of *force majeure*, and ii) the Party must establish that such situation (of the third party) has affected its own ability to perform under the U/N Contract. The burden of proof lies on the party which intends to rely on Article 12 of the U/N Contract pursuant to the general principle of Article 8 of the Swiss Civil Code.[2]

266. For the factual reasons that will be developed below, the Sole Arbitrator finds that these conditions are not met in the present case and that Respondent has not established that the requirements of Article 12 of the U/N Contract would be fulfilled in the present case.

267. The *force majeure* event relied upon by Respondent is related to Dioxitek's financial situation. According to Respondent, Dioxitek was in situation such that it could not generate *"the necessary cash flow in order to make payment to Respondent"* (Answer, § 41).

268. In support of these arguments, Respondent rely on four letters sent between 23 June 2016 and 9 May 2017 (<u>Exhibits C-31, C-33, C-35 and C-37</u>). In these letters, Dioxitek explains its difficulties to Respondent and to Claimant (since the letter of 30 December 2016 is sent directly to Claimant, <u>Exhibit C-35</u>). Dioxitek insists on the *"difficult situation"*, including the *"precarious situation and the perilous commercial position"* of the company (<u>Exhibits C-31 and C-37</u>). These letters are not supported by any appendices, such as financial statements. Further, Respondent has not produced any evidence concerning the financial situation of Dioxitek. In view of the evidence on file, the Sole Arbitrator is not in a position to determine if Dioxitek was financially able or unable to pay Respondent under the N/D Contract.

---

[2] Article 8 of the Swiss Civil Code reads as follows: *"Unless the law provides otherwise, the burden of proving the existence of an alleged fact shall rest on the person who derives rights from that fact."*

269. Irrespective as to whether *"liquidity issues"* can as such be raised as a *force majeure* argument (see SoC, § 105 and C. Brunner, *op.cit.*, Exhibit CL-32, N 11), the Sole Arbitrator finds that Respondent has not established that the third party (Dioxitek) was in a situation of *force majeure*. For this first reason, Respondent's *force majeure* argument must be dismissed.

270. In addition, Respondent has not provided the Sole Arbitrator with evidence concerning its own inability to perform under the U/N Contract.

271. Respondent's performance obligations were to pay Claimant and to take delivery of $U3O8$. As a matter of principle, the obligor is liable for its own economic ability to perform and cannot invoke a lack of funds as a situation of *force majeure*. In his commentary of Article 79 CISG, a scholar has summarized the *force majeure* principles in connection with the buyer's inability to pay in the following terms:

> *"The buyer's sphere of control also includes his having money to pay the purchase price. Liquidity issues do not exempt him. It further falls into the buyer's sphere of control to ensure that he has the necessary foreign currencies to pay the purchase price. The buyer can exempt himself only if payment in the foreign currency is forbidden due to an act of state and payment is not possible by any other means, or would be unreasonable according to good faith."*

(C. Brunner, *op.cit.*, Exhibit CL-32, N 11).

272. Respondent has not established that it was in a situation of *force majeure* preventing it from paying (*e.g.* because of a prohibition to use the contractual currency or other regulatory reasons). It has also not established that it was unable to pay Claimant, *e.g.* by resorting to loans and trying to resell the goods to another buyer in view of Dioxitek's default. In particular, Respondent has not explained why, during the time passed between June 2016 and the next delivery scheduled in 2017 (see Exhibits C-34 and C-36), it was unable to find another buyer to replace Dioxitek. In fact, Respondent has not even asserted that it tried.

273. Respondent appears to simply consider that Dioxitek's default releases it (Respondent) from its commitment *vis-à-vis* Claimant. As Respondent puts it in its Statement of Defence, *"Dioxitek defaulted on the contract with NYNCO and did not pay NYNCO for what was owed for the last delivery. As a result, NYNCO could not pay UG for that last delivery or continue to buy more uranium"* (SoD, p. 2).

274. Respondent's position cannot be the basis for a *force majeure* defence. Under any standard, the absence of payment by a customer cannot justify a *force majeure* defence and cannot constitute a sufficient impediment to perform under the notion of *force majeure*.

275. In fact, Respondent's position shows that it considers the U/N Contract as being conditional upon the performance of the N/D Contract. For the reasons that will be developed below (§ 278-287), this is not the situation in the present case.

276. In view of the above, the Sole Arbitrator finds that Respondent has not established that Dioxitek's situation has affected its (Respondent's) ability to perform under the U/N Contract. For this second reason, Respondent's *force majeure* argument must be dismissed.

277. In summary, the Sole Arbitrator determines that Respondent's obligations were not suspended or otherwise excused under the *force majeure* clause set out in Article 12 of the U/N Contract. He will now turn to the other arguments relied upon by Respondent in these proceedings.

    *ii)    Nature of the contractual relationship (the U/N Contract as a "screen")*

278. Respondent's arguments concerning the nature of the contractual relationship, in particular Respondent's characterization of the U/N Contract as a *"screen"* strongly resemble the arguments already advanced by Respondent to support its request to join Dioxitek as party to these proceedings. In particular, Respondent's position that it was a *"screening Trader"* are similar, if not identical, to the assertion already made in the jurisdictional phase that the U/N Contract only represented one side of a *"three-party transaction"* where Respondent merely served as an *"intermediary"* (Request for Joinder, § 53; Respondent's Second SoJ, § 43; see also Partial Award, § 157).

279. As noted above (§ 253), the relationship between the U/N Contract and the N/D Contract was already analysed in the Partial Award. The Sole Arbitrator found, in particular, that the two Contracts are not *"interconnected"* (§ 241), that the analysis of the facts do not reveal an intention of the Parties (and of Dioxitek) to enter into a *"trilateral"* relationship forming *"one economic transaction"* (§ 245), that the facts (including the two most important documents, namely the Contracts) confirm that there were two separate contractual relationships (§ 245), that Respondent was a buyer under the U/N Contract and a (re)seller under the N/D Contract and not a commission agent for Claimant and/or the Additional party (Dioxitek) (§ 257), and that the two Contracts hence constitute a *"chain of contracts"* as opposed to *"one unique transaction"* (§ 258).

280. In the phase on the merits, Respondent has not brought evidence that would lead the Sole Arbitrator to revisit his previous findings on these issues. Respondent has in fact not taken into account such findings and has not discussed the Partial Award in its submissions on the merits.

281. Based on the findings made in the Partial Award, Respondent was a buyer under the U/N Contract and a (re)seller under the N/D Contract. Under such contractual scheme, there is no basis to assert, as Respondent does, that the *"U308 Buyer takes the risk of the performance of the U308 Seller"*. Rather, the intermediary (or, according to Respondent's terminology, the *"Screening Trader"*) bears the risk (and also the benefit) of both contracts (unless a contractual provision provides otherwise, see paragraph 285 below on this issue).

282. In addition, the notion of *"screen"* and *"sleeve"* transactions are not recognized under Swiss law or under the CISG, and Respondent has not provided any legal analysis supporting this distinction and its legal relevance.

283. Rather, Respondent appears to describe, in layman's terms, its understanding of the contractual practice in the industry. Even if one were to follow Respondent's explanations as notably given in Appendix A to the Rejoinder (explanations which are disputed by Claimant), they would be of limited relevance because they do not examine the contents of the contracts at stake.

284. By the same token, Respondent's *"understanding"* that *"[i]f there was a problem with a screening deal, the French would work with NYNCO in good faith to fix the problem"* is not a valid legal argument because Respondent does not identify any contractual duty to *"fix the problem"*.

285. Respondent's position would only be valid if the U/N Contract contained a specific provision, whereby Claimant would cover Respondent in the event of a default by Dioxitek under the N/D Contract, or a condition to the effect that the obligations under the U/N Contract would depend on the performance by Dioxitek of the N/D Contract. However, Respondent has not identified any such contractual provision or condition, and none exists in the U/N Contract.

286. In this respect, it is worth noting that Claimant and Respondent have entered into at least one contract (produced by Claimant as <u>Exhibit C-48</u>), which contains a clause expressly conditioning a party's obligation to perform upon successful conclusion of related transactions.[3] This contract (produced as <u>Exhibit C-48</u>) has limited probative value for the determination of the Parties' intentions when drafting the U/N Contract. However, it shows that the Parties were aware of and have used a clause conditioning one of their contract to another related transaction. There is no such mechanism in the U/N and N/D Contracts.

287. In view of the above, Respondent's arguments related to the nature of the contractual relationship, in particular its arguments concerning the alleged *"screen"* nature of the U/N Contract, are denied and do not provide any justification to Respondent for not complying with its contractual duties under the U/N Contract.

---

[3] *".. IT IS EXPRESSLY UNDERSTOOD THAT IN THE EVENT SELLER, FOR ANY REASON, CANNOT CONCLUDE THE RELATED TRANSACTION ATTACHED TO ANY QUANTITY SOLD, THE SALE AND DELIVERY OF THAT QUANTITY SHALL BE CONSIDERED TO BE NULL AND VOID IN ITS ENTIRETY"* (<u>Exhibit C-48</u>, Article 2 g., p. 1).

**D.**   **CLAIMANT'S CLAIM FOR OUTSTANDING PAYMENT FOR THE DELIVERY OF JUNE 2016**

*1)*   *Claimant's position*

288.   Claimant states that Respondent breached the U/N Contract by failing to pay for the entirety of the U3O8 delivered in June 2016 and submits that, as a consequence, Claimant is entitled to the payment of USD 3'556'862.48 corresponding to the outstanding amount due under the invoice issued by Claimant on 18 June 2016 (Exhibit C-26) (Request, § 62; SoC, § 115).

289.   Claimant relies on Article 74 CISG and states that Respondent's failure to pay for the totality of the June 2016 delivery constitutes a breach of the U/N Contract and that the recoverable *"damage"* caused by the breach is the equal to the outstanding amount of USD 3'556'862.48 (SoC, § 115-116).

*2)*   *Respondent's position*

290.   Respondent does not dispute that it failed to pay for the entirety of the U3O8 delivered in June 2016 or that such payment default could potentially constitute a breach of the U/N Contract (see, in particular, Answer, § 34-44).

291.   However, in its Answer filed on 4 December 2017 and with reference to the Payment Schedule of 28 September 2017 (Exhibit RJ-30), Respondent submitted that Claimant's claim for payment of USD 3'556'862.48 was *"not yet due"*, *"premature"* and hence *"not admissible"* (Answer, § 34, 35, 37 and 51).

292.   Respondent also argued that it was excused for non-performance under the *force majeure* clause in Article 12 of the U/N Contract (Answer, § 38-44; see also § 200-205 above).

293.   In its subsequent submissions filed after expiry of the time limits set out in the Payment Schedule of 28 September 2017 (Exhibit RJ-30), Respondent has maintained that it was excused for non-performance for *force majeure* and introduced a second line of defence relating to the nature of the contractual relationship (the U/N Contract as a *"screen"*) (SoD, p. 1-2; Rejoinder, p. 2-3 and Appendix A; see also § 206-212 above).

294.   Respondent has not disputed the validity of the invoice issued by Claimant on 18 June 2016 (Exhibit C-26) as such, the outstanding amount of USD 3'556'862.48 or the validity of the Payment Schedule of 28 September 2017 (Exhibit RJ-30). Rather, Respondent has acknowledged and explained that the purpose of the Payment Schedule of 28 September 2017 (Exhibit RJ-30) was *"to complete the payment for the June 2016 delivery"* and that Claimant *"knew that NYNCO could only pay UG if NYNCO was paid by Dioxitek"* (Rejoinder, p. 5).

### 3)   The Sole Arbitrator's determinations

295.   Claimant claims an amount of USD 3'556'862.48 which corresponds the unpaid portion of the invoice amounting to USD 9'556'862.48 issued by Claimant on 18 June 2016 (Exhibit C-26).

296.   Respondent has not disputed that it failed to pay for the entirety of the U3O8 delivered in June 2016. Respondent has also not disputed the validity of the invoice issued by Claimant on 18 June 2016 (Exhibit C-26) or the outstanding amount of USD 3'556'862.48 (see, in particular, Answer, § 34-44).

297.   In addition, by signing the Payment Schedule for the *"delivery made on June 16, 2016"* on 28 September 2017 (Exhibit RJ-30), Respondent acknowledged its residual debt under the invoice of 18 June 2016 (Exhibit C-26) and committed to pay to Claimant the unpaid balance in three instalments. Respondent has not contested the validity of this document and has acknowledged and explained that its purpose was *"to complete the payment for the June 2016 delivery"* (Rejoinder, p. 5).

298.   Respondent's defence that the claim is *"premature"* because the payments are *"not yet due"* under Payment Schedule (Answer, § 34) is no longer relevant. The last payment was due on 20 June 2018 under the Payment Schedule (Exhibit RJ-30), which is before the date of the present Final Award. The entire amount of the payment is hence indisputably due as of today's date. The incidence of the Payment Schedule for the payment of the interest will be addressed below (§ 311-317).

299.   For the rest, Respondent has raised defences on the basis of the *force majeure* clause set out in Article 12 of the U/N Contract (see § 200-205 above) and relating to the nature of the contractual relationship (the U/N Contract as a *"screen"*) (see § 206-212 above). Both lines of defences were dismissed above in paragraphs 239-277 and 278-287, respectively.

300.   It follows that Respondent breached the U/N Contract when it failed to pay the totality of the amount invoiced on 18 June 2016, that the unpaid portion of the invoice amounts to USD 3'556'862.48, and that such sum is due.

301.   Claimant invokes Article 74 CISG and states that the recoverable *"damage"* caused by the breach is the equal to the outstanding amount of USD 3'556'862.48.

302.   Article 74 CISG reads as follows:

> *"Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract."*

303. The Sole Arbitrator agrees that the loss suffered by Claimant is equal to the outstanding amount of the invoice issued on 18 June 2016 and amounts to USD 3'556'862.48.

304. In view of the above, Claimant's claim for payment of USD 3'556'862.48 is <u>granted</u>.

E.   **CLAIMANT'S CLAIM FOR INTEREST**

*1)   Claimant's position*

305. Claimant claims *"delay interest"* on the amount of USD 3'556'862.48 from 19 July 2016 until the date of the present Final Award (SoC, § 123; Reply to the Rejoinder, prayer for relief no. (v)).

306. Claimant states that interest starts from the date at which the payment should have been made (SoC, § 119). Relying on Article 5.1 of the U/N Contract, which provides that payment shall be effected 30 days after delivery, Claimant considers that payment was due on 18 July 2016 (since delivery was made on 18 June 2016) and that the interest accrued on 19 July 2016.

307. Claimant invokes the *"contractual rate"* under Article 5.2 of the U/N Contract and explains that the applicable LIBOR rate in force on the starting date (19 July 2016) was 1.3289% (SoC, § 124, referring to <u>Exhibit C-45</u>).

308. Claimant has produced as <u>Exhibit C-46</u> an *"[i]nterest calculation method"* (SoC, note 93 to § 125). As of the date of the Reply to Rejoinder submitted on 30 September 2020, the amount of interest due was USD 495,197.49 according to Claimant.

309. Claimant has not claimed post-award interest.

*2)   Respondent's position*

310. Respondent has not taken position on Claimant's claim for interest.

*3)   The Sole Arbitrator's determinations*

311. In its prayer for relief no. (v), Claimant claims *"delay interest at the contractual rate for the period going from 19 July 2016 to the date that the arbitral award is rendered, currently amounting to USD 495,197.49"*.

312. Respondent has not taken position on Claimant's interest claim. However, Respondent does not appear to oppose the principle of interest insofar as Respondent itself seeks interest on its counterclaims (Rejoinder, p. 7).

313. Article 5.1 of the U/N Contract provides that *"Payment shall be effected 30 days after Delivery by wire transfer to Seller's bank account designated by Seller in the applicable invoice"*. It is not disputed that delivery was made on 18 June 2016 and, pursuant to this contractual provision, the payment was due on 18 July 2016. Accordingly, the Sole Arbitrator agrees with Claimant that interest accrues as from 19 July 2016.

314. The Sole Arbitrator will not apply the later payment dates referred to in the Payment Schedule of 28 September 2016 (Exhibit RJ-30) because the Parties were ultimately unable to find an amicable settlement to end their dispute (Rejoinder, p. 5).

315. Article 5.2 of the U/N Contract provides that delay interest is payable at *"the rate of the London Interbank Offered Rate (LIBOR) as published by the British Banker's Association (BBA) plus two percentage points (2%) on any amount that is not paid by the due date"*.

316. On 19 July 2019, the LIBOR rate for USD currency (maturity of 1 year) was 1.3289% (Exhibit C-45).

317. Applying Article 5.1 and 5.2 of the U/N Contract, the Sole Arbitrator will hence award Claimant interest at the rate of 3.3289% per annum on the amount of USD 3'556'862.48 as from 19 July 2016 until the date of the present Final Award. As at 1 February 2021, such interest amounts to USD 537'847.91.

**F.   CLAIMANT'S CLAIM FOR DAMAGES FOR BREACH OF OBLIGATIONS TO TAKE DELIVERY DURING THE YEARS 2016-2019**

*1)   Claimant's position*

318. Claimant submits that, under Article 74 CISG and Article 42(2) of the Swiss Code of Obligations (**"CO"**), it is entitled to claim damages for Respondent's breach of obligations to take delivery of U3O8 during the years 2016-2019 (SoC, § 126-128).

319. Claimant disputes that Respondent was excused for non-performance under the *force majeure* clause in Article 12 of the U/N Contract (see § 217-231 above).

320. Claimant states that the recoverable damages under said provisions consist of lost profits, more specifically the lost *"profit margin that it would have obtained"* had Respondent fulfilled its obligations and taken delivery of U3O8 under the U/N Contract (SoC, § 127-132).

321. Claimant explains that the lost profit margin corresponds to the difference between the price Claimant paid to its own supplier (at the time Areva Mines, now Orano Mines) and the price charged to Respondent under the U/N Contract (SoC, § 133).

322. Claimant has produced the contract with its own supplier, as amended on 3 May 2016 (Exhibits C-42 and C-44) (the "**OM/U Contract**") and provided a chart comparing the prices under such supply contract with the prices under the U/N Contract. In such chart, the differences between the prices are added up to the amount claimed by Claimant in prayer for relief no. (vi), namely USD 1'793'872.32 (SoC, § 134; see also, SoC, § 25-28).

323. Claimant states that it concluded a contract with *"another supplier for the year 2016"* and that such contract is *"confidential"*. Claimant stresses that, although the prices under such other supply contract was *"more advantageous for UG"* than the prices under the OM/U Contract, it *"only claims the loss of profit that it would have made on the basis of the OM/U Contract for these quantities that represent a small amount of the total quantities for the year 2016"* (SoC, footnote 96 to § 134).

### 2)   Respondent's position

324. Respondent does not dispute that it failed to take delivery of U3O8 for the years 2016 to 2019 or that such failure could potentially constitute a breach of the U/N Contract (see, in particular, Answer, § 38-44).

325. Respondent submits that it was excused for non-performance under the *force majeure* clause in Article 12 of the U/N Contract (see § 200-205) and for reasons relating to the nature of the contractual relationship (the U/N Contract as a *"screen"*) (see § 206-212 above).

326. Respondent also stresses that Article 12.5 of the U/N Contract makes clear that, in case of *force majeure*, Claimant is not entitled to damages at all, even if Claimant may have been entitled to terminate the U/N Contract (Answer, § 45).

327. In the alternative, Respondent submits that Claimant has failed to sufficiently substantiate the quantum of its damages and that Claimant has failed to demonstrate that it complied with its duty to mitigate them (Answer, § 47-49).

328. In the Answer, Respondent underscored that it contested *"not only the existence and legitimacy"* of Claimant's damage claim which at that time amounted to USD 61'443'137.52, but also *"the substantiation and calculation of the amount requested"* (Answer, § 48).

329. In the Statement of Defence, Respondent did not comment on the precise quantification of Claimant's damage claim which had been significantly reduced to USD 1'793'872.32 in the Statement of Claim. However, it asserted that Claimant had not made losses on the transaction with Respondent and stressed that the transaction was *"very profitable"* for Claimant (SoD, p. 3). This argument was maintained also in the Rejoinder (p. 3 and 6).

*3)*   ***The Sole Arbitrator's determinations***

330.   Claimant's damage claim relates to Respondent's failure to take delivery of U3O8 during the years 2016-2019 (SoC, § 126-128).

331.   Respondent does not dispute that it failed to take delivery of U3O8 for the years 2016 to 2019 or that such failure could potentially constitute a breach of the U/N Contract (see, in particular, Answer, § 38-44).

332.   The Sole Arbitrator dismissed above Respondent's defences relating to *force majeure* (§ 239-277) and to the nature of the contractual relationship (the U/N Contract as a *"screen"*) (§ 278-287).

333.   It follows therefrom that Respondent breached the U/N Contract when it failed to take delivery of U3O8 as agreed during the years 2016-2019 (Exhibits C-8 and C-23). Article 12.5 of the U/N Contract does not release Respondent of its liability because this contractual provision only applies in case of cancelation of the contract for *force majeure*, which is not what happened in the present case.

334.   Under Article 74 CISG (quoted above in § 302), the recoverable damage for breach of contract is the "*sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach*".

335.   Claimant can hence claim the lost profit it would have obtained *but for* Respondent's breach, *i.e.* the profit margin it would have earned if Respondent had taken delivery of U3O8 as agreed.

336.   Claimant has quantified and explained its damage claim in paragraphs 133 to 136 of the Statement of Claim and has provided a chart setting out the lost profit margins (SoC, § 134).

337.   The chart included in paragraph 134 of the Statement of Claim compares the prices, per lb, set out in the U/N Contract and the prices, per lb, set out in Claimant's contract with its own supplier, namely the OM/U Contract.

338. The chart included in paragraph 134 of the Statement of Claim is as follows:

| Years | 2017 (2016 deliveries postponed) | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Price UG/OM (USD/lb) | 41.55 | 52.23 | 54.59 | 55.27 |
| Price NYNCO/UG (USD/lb) | 42.40 | 53.30 | 55.70 | 56.40 |
| Difference between prices (USD/lb) | 0.85 | 1.07 | 1.11 | 1.13 |
| Quantity (lbs U308) | 216,566.75 (83,301.6 kgU) | 441,964.47 (170,000 kgU) | 441,964.47 (170,000 kgU) | 571,954.02 (220,000 kgU) |
| UG's margin (USD) | 184,081.74 | 472,901.98 | 490,580.56 | 646,308.04 |
| TOTAL of UG's margin (USD) | 1,793,872.32 | | | |

339. The Sole Arbitrator understands that the chart effectively compares the prices set out in *"Amendment No. 2"* of 18 January 2016 to the U/N Contract (<u>Exhibit C-23</u>) and the prices set out in the "Second Amendment" of 3 May 2016 (<u>Exhibit C-44</u>) to the contract concluded between Claimant and Areva Mines on 29 June 2012 (<u>Exhibit C-42</u>).

340. The Sole Arbitrator observes that the prices set out in Claimant's chart match the prices indicated in <u>Exhibits C-23 and C-44</u> and that the quantities (in lbs) indicated in the chart match the quantities (in kgU) set out in <u>Exhibit C-23</u>, less the U3O8 delivered in June 2016.

341. The Sole Arbitrator also notes that Claimant's calculations, arriving at a total loss of USD 1'793'872.32, are mathematically correct, including the conversion from kgU to lbs pursuant to Article 3 of the U/N Contract (<u>Exhibit C-8</u>, p. 3).

342. Respondent has not contested the information contained in Claimant's chart or otherwise questioned Claimant's calculations.

343. Further, Respondent has not made any requests for production of documents, produced documents on its own motion or requested any other evidentiary measures (for instance witness testimony) relating to reality of and the basis for the quantification of Claimant's losses.

344. The Sole Arbitrator notes that Claimant has refrained from producing a contract with *"another supplier for the year 2016"* because such contract is *"confidential"*. However, such other contract would have increased the amount of the damages because the prices under such other contract were *"more advantageous"* for Claimant (SoC, footnote 96 to § 134). By

not submitting this other contract in the proceedings, Claimant has in fact limited the amount of its claim to the difference in the prices between the OM/U Contract and the U/N Contract. The absence of production of the other confidential contract has hence no impact on the amount of damages awarded to Claimant because this other contract could only have played to the detriment of Claimant and in favour of Respondent.

345. On the basis of the explanations and documentation provided by Claimant, in particular Exhibits C-42 and C-44, and in the absence of specific and substantiated rebuttal arguments by Respondent on the precise calculation of Claimant's lost profit margin, the Sole Arbitrator is satisfied that Claimant has established a loss profit amounting to USD 1'793'872.32.

346. In view of the above, Claimant's claim for payment of USD 1'793'872.32 is granted.

## G.   RESPONDENT'S COUNTERCLAIMS AGAINST CLAIMANT

### 1)   Respondent's position

347. In it Rejoinder filed on 14 July 2020, Respondent introduced two counterclaims against Claimant: (i) USD 26.8 million corresponding to 50% of Claimant's profit from "*the complex chain deal (described in Appendix B)*" and (ii) "*the difference between the three settlement payments NYNCO had planned to pay UG and the three settlement payments Dioxitek had planned to pay NYNCO resulting from the September 28, 2017 meeting in New York*" (Rejoinder p. 7).

348. With respect to the claim for a 50% share of Claimant's profit, Respondent argue that the "*complex chain deal (described in Appendix B)*" could not have been done without "*intensive use of NYNCO's screening services*" and that it would therefore be "*fair*" that Respondent be "*awarded in relief*" half of that amount (Rejoinder p. 7).

349. Respondent appears to rely on the same consideration of "*fair[ness]*" to support its claim for "*the difference between the three settlement payments NYNCO had planned to pay UG and the three settlement payments Dioxitek had planned to pay NYNCO resulting from the September 28, 2017 meeting in New York*" (Rejoinder p. 7).

350. With regard to the quantum of its claims, Respondent states that it performed "*screening services*" for Claimant "*multiple times*" and that such "*very profitable pattern of links forming a chain that constituted the complete transaction*" generated profits for Claimant and Claimant's parent company in the amount of USD 53.6 million (Rejoinder, p. 3).

351. Respondent has filed as Exhibit 4 to the Rejoinder a table setting out Respondent's *"UG/Orano Profit Estimate"*. Respondent explains that *"[t]he Pounds U3O8 column shows the actual number of pounds screened by NYNCO to Dioxitek per year"*, that *"[t]he UG revenue is the exact amount of dollars NYNCO wired to UG each year under the contract"* and that the *"UG/Orano cost is based on the number of pounds UG is estimated to have screened for Orano in the spot market times the average spot price for each year"* (Rejoinder, p. 6).

352. Respondent stresses that its *"cost assumptions are good because NYNCO was used as a screen for most of the material sourced by UG in the spot market over the long-term contract period"* (Rejoinder, p. 6).

### 2)   Claimant's position

353. Claimant submits that Respondent's counterclaims *"lack and substance and seriousness"* and *"lack any legal basis"* (Reply to the Rejoinder, § 30-31).

354. Claimant also states that Respondent's explanations in the Rejoinder and its Appendix B are *"incorrect"* and *"pure nonsense"* (Reply to the Rejoinder, § 30-31).

355. Claimant stresses that *"even if they were true"*, Respondent's explanations would be *"irrelevant to the present arbitration, which deals with NYNCO's failure to pay and take delivery of U308 since 2016"* (Reply to the Rejoinder, § 13).

356. Claimant asserts that *"[t]he only contract that is relevant to the facts of this case is the U/N Contract"* and that the other contracts mentioned in the Rejoinder and Appendix B are *"irrelevant"* and *"not linked"* to the U/N Contract, *"even if UG always admitted on a strict business standpoint that the ultimate buyer was DIOXITEK and not NYNCO"* (Reply to the Rejoinder, § 15-16).

357. Claimant also points to the fact that Respondent has not produced the contracts mentioned in the Rejoinder and Appendix B and underscores that *"a look at them shows that neither the timing nor the quantities of U308 support [Respondent's] conclusion"* (Reply to the Rejoinder, § 17).

358. Claimant also disputes that Claimant and Claimant's parent company would have profited USD 53.6 million and states that Respondent's assertion is *"false"* and based on *"incorrect"* numbers (Reply to the Rejoinder, § 18).

*3)*   **The Sole Arbitrator's determinations**

359.   Respondent relies on *"fair[ness]"* to support its claim for 50% of Claimant's profit in the amount of USD 53.6 million from the *"chain deal"* described in Appendix B and Exhibit 3 to the Rejoinder.

360.   Such *"chain deal"*, as presented by Respondent, appears to include the U/N Contract (*"K2"*), the N/D Contract (*"K1"*) and four other contracts and groups of contracts (including, for instance, *"a series of 'in house' spot market purchases"* (*"K4"*) and *"a series of 7 screened deals"* (*"K5"*)) (Rejoinder, Appendix B and Exhibit 3).

361.   Respondent has not produced the four other contracts and groups of contracts or otherwise established their existence and contents.

362.   Respondent has also not explained how the four other contracts and groups of contracts would relate to the U/N Contract or why and on what legal basis it would be *"fair"* to take them into account in the assessment of a claim brought under the U/N Contract. The U/N Contract does not contain an *"equity"* clause allowing the Sole Arbitrator to decide the case on the basis of *"fairness"*. Respondent has not explained on which contractual or statutory basis its claim for 50% of Claimant's profit in the chain deal would be based. Respondent's counterclaim hence lacks any legal foundation and, for this first reason, must be dismissed.

363.   In addition, Respondent has not produced any supporting documents to the table setting out Respondent's *"UG/Orano Profit Estimate"* (Exhibit 4 to the Rejoinder) or any other documents that would shed light on the financial aspects of the four contracts and groups of contracts described in Appendix B and Exhibit 3 to the Rejoinder. Respondent has hence not produced any evidence that would support and allow the Sole Arbitrator to assess Respondent's explanations concerning the financial aspects of the *"chain deal"* that supposedly generated USD 53.6 million profits for Claimant and Claimant's parent company. The amount of USD 53.6 million is hence not established and, for this second and additional reason, Respondent's counterclaim must be dismissed.

364.   The same is true with respect to the claim for *"the difference between the three settlement payments NYNCO had planned to pay UG and the three settlement payments Dioxitek had planned to pay NYNCO"*. In particular, Respondent has not produced unredacted versions of <u>Exhibits RJ-29 and RJ-30</u> or otherwise explained what the *"difference"* between the payments envisaged therein would be. In addition, apart from the reference to *"fair[ness]"* (Rejoinder, p. 7)*,* Respondent has not provided any explanations as to why and on what legal basis Respondent would be entitled to such difference. Respondent also seems to refer to settlement payments that were *"planned"* and that were ultimately not paid and it does not explain how such planned payment could result in a liability on the part of Claimant.

ANALYSIS OF

365. It follows therefrom that Respondent has failed to substantiate its counterclaims. Such counterclaims lack any legal foundation and the amounts alleged by Respondent have not been established. Respondent's counterclaims hence must be <u>dismissed</u>.

## H. ANALYSIS OF THE PARTIES' PRAYERS FOR RELIEF

### 1) Claimant's prayers for relief

366. In its prayer for relief no. (i), Claimant requests that the Sole Arbitrator *"[d]eclare that Respondent is in breach of its obligations under the U/N Contract to fully pay Claimant for the U308 delivery of June 2016"* (see above, § 110).

367. It was established above that Respondent's obligations were not excused under the *force majeure* clause set out in Article 12 of the U/N Contract (§ 239-277) or in view of the nature of the contractual relationship (§ 278-287) and that Respondent breached the U/N Contract when it failed to pay the totality of the amount invoiced on 18 June 2016 (§ 300).

368. In view of the above, Claimant's prayer for relief no. (i) is <u>granted</u>.

369. In its prayer for relief no. (ii), Claimant requests that the Sole Arbitrator *"[d]eclare that Respondent is in breach of its obligation under the U/N Contract to purchase the remaining quantity of U308 to be delivered between 2016 and 2019"* (see above, § 110).

370. It was established above that Respondent's obligations were not excused under the *force majeure* clause set out in Article 12 of the U/N Contract (§ 239-277) or in view of the nature of the contractual relationship (§ 278-287) and that Respondent breached the U/N Contract when it failed to take delivery of U3O8 as agreed during the years 2016-2019 (§ 333).

371. In view of the above, Claimant's prayer for relief no. (ii) is <u>granted</u>.

372. In its prayer for relief no. (iii), Claimant requests that the Sole Arbitrator *"[d]eclare that the U/N Contract is avoided for the future"* (see above, § 110).

373. The Sole Arbitrator notes that Article 64(1) CISG provides that a seller may declare a contract avoided where the buyer commits a *"fundamental"* breach of Contract. Lack of payment is a fundamental breach of contract on the buyer's side since the payment of the price is the main obligation of the buyer. In the present case, Respondent did not fully pay for the U308 delivery of June 2016 and refused to purchase the remaining quantity of U308 to be delivered between 2016 and 2019. Respondent hence committed a fundamental breach of contract allowing Claimant to declare the contract avoided for the future. Further, Claimant has declared that it considered that the U/N Contract was avoided in its termination letter of 1 September 2017 (<u>Exhibit C-40</u>).

374. In view of the above, the U/N Contract has been validly avoided by Claimant and Claimant's prayer for relief no. (iii) is granted (being understood that *"for the future"* means here the period following Claimant's termination letter of 1 September 2017).

375. In its prayer for relief no. (iv), Claimant requests that the Sole Arbitrator *"[o]rder Respondent to pay USD 3,556,862.48 to Claimant corresponding to the outstanding amount owed to UG for the U308 delivery of June 2016"* (see above, § 110).

376. It was established above (§ 295-304) that Claimant is entitled to its claim for USD 3'556'862.48 corresponding to the outstanding amount under the invoice of 18 June 2016.

377. In view of the above, Claimant's prayer for relief no. (iv) is <u>granted</u>.

378. In its prayer for relief no. (v), Claimant requests that the Sole Arbitrator *"[o]rder Respondent to pay delay interest at the contractual rate for the period going from 19 July 2016 to the date that the arbitral award is rendered, currently amounting to USD 495,197.49"* (see above, § 110).

379. It was established above that Claimant is entitled to 3.3289% interest per annum on USD 3'556'862.48 as from 19 July 2016 until the date that this Final Award is rendered (§ 311-317). As at 1 February 2021, such interest amounts to USD 537'847.91.

380. In view of the above, Claimant's prayer for relief no. (v) is <u>granted</u>.

381. In its prayer for relief no. (vi), Claimant requests that the Sole Arbitrator *"[o]rder Respondent to pay USD 1,793,872.32 to Claimant for the damages suffered due to the non-performance of its undertakings for the deliveries for the years 2016-2019"* (see above, § 110).

382. It was established above (§ 330-346) that Claimant is entitled to its claim USD 1'793'872.32 corresponding to lost profit during the years 2016-2019.

383. In view of the above, Claimant's prayer for relief no. (vi) is <u>granted</u>.

384. In its prayer for relief no. (vii), Claimant requests that the Sole Arbitrator *"[d]ismiss the new claims made by Respondent in its Statement of Rejoinder"* (see above, § 110).

385. It was established above (§ 359-365) that Respondent has failed to substantiate its counterclaims raised in the Rejoinder.

386. In view of the above, Claimant's prayer for relief no. (vii) is <u>granted</u>.

387. Claimant's prayer for relief no. (viii) (arbitration costs) will be addressed below in part **X**.

388. In its prayer for relief no. (ix), Claimant requests that the Sole Arbitrator *"[o]rder provisional enforcement of the award, notwithstanding any recourse against it or against its enforcement in any local jurisdiction"* (see above, § 110).

389. The Sole Arbitrator observes that *"provisional enforcement"* is not a concept that is recognized under Swiss arbitration law because the award is automatically enforceable as from its communication to the parties irrespective of any decision by the arbitrator to this effect (B. Berger/F. Kellerhals, International and Domestic Arbitration in Switzerland, 3rd Ed, Berne 2014, p. 575 N 1633). In addition, the action for setting aside under Article 190 of the Swiss Private International Law Act does not stay the enforcement of the award (Berger/Kellerhals, *op. cit.*, p. 575 N 1634). Claimant has also not explained the background and basis for this prayer for relief or why it would be relevant in this arbitration. Accordingly, the Sole Arbitration is not in a position to grant Claimant's prayer for relief no. (ix).

390. In view of the above, Claimant's prayer for relief no. (ix) is <u>dismissed</u>.

### 2)   Respondent's prayers for relief

391. In its Rejoinder, Respondent made three-fold prayers for relief raising three counterclaims against Claimant, namely (i) that Claimant be ordered to pay to Respondent, "*in relief*", 50% ("*$26.8 million*") of Claimant's USD 53.6 million profit from "*the complex chain deal (described in Appendix B)*", (ii) "*plus the difference between the three settlement payments NYNCO had planned to pay UG and the three settlement payments Dioxitek had planned to pay NYNCO resulting from the September 28, 2017 meeting in New York*" and (iii) "*plus interest from the date UG filed the Arbitration (September 5, 2017)*" (see § 112 above and Rejoinder, p. 7).

392. Respondent also requested reimbursement of "*all legal expenses NYNCO has suffered as a result of this arbitration plus interest*" (see § 112 above and Rejoinder, p. 7)

393. It was established above (§ 359-365) that Respondent has failed to substantiate its counterclaims against Claimant. Accordingly, Respondent's prayers for relief relating to (i) "50% ("*$26.8 million*") of Claimant's USD 53.6 million profit from "*the complex chain deal (described in Appendix B)*" and (ii) "*difference between the three settlement payments NYNCO had planned to pay UG and the three settlement payments Dioxitek had planned to pay NYNCO resulting from the September 28, 2017 meeting in New York*" are <u>dismissed</u>.

394. Since no sums are due to Respondent, no interest is due to Respondent. Accordingly, Respondent's prayer for relief relating to "*interest from the date UG filed the Arbitration (September 5, 2017)*" is <u>dismissed</u>.

395. Respondent's request for reimbursement of legal expenses will be addressed below in part **X**.

## X.   COSTS

### A.   INTRODUCTION

396. Pursuant to Article 38(1) ICC Rules, the costs of the arbitration are composed of the fees and expenses of the Sole Arbitrator and the ICC administrative expenses, as well as the reasonable legal and other costs of the Parties.

397. In the Partial Award on Jurisdiction of 18 April 2019, the Sole Arbitrator determined the allocation of the legal fees and expenses incurred by the Parties in the first phase of the arbitration, excluding the fees and expenses of the Sole Arbitrator and the ICC administrative expenses (Article 38(3) ICC Rules) (Partial Award, § 275-287). More specifically, in view of the outcome of the Partial Award, the Sole Arbitrator ordered Respondent to reimburse Claimant and Dioxitek for their legal fees and expenses incurred in the first phase of the arbitration (Partial Award, § 285 and 286). Dioxitek's expenses included a payment of USD 75'000 to the ICC towards the advance on costs (Partial Award, § 285).

398. Pursuant to Article 38(4) ICC Rules, this Final Award shall determine the costs of the arbitration and decide the allocation of the costs incurred in connection with the proceedings, including the fees and expenses of the Sole Arbitrator, the ICC administrative expenses and the reasonable legal and other costs of the Parties incurred in the second phase of the arbitration.

### B.   DETERMINATION AND APPORTIONMENT OF THE COSTS OF ARBITRATION

#### 1)   Fees and expenses of the Sole Arbitrator and ICC ("ICC Costs of Arbitration")

399. On 8 February 2018, the ICC Court fixed the advance on costs at USD 300'000. The advance on costs has since been paid by Claimant (USD 150'000), Respondent (USD 80'000) and Dioxitek (USD 75'000). As noted above (§ 397), in the Partial Award, Respondent was ordered to reimburse Dioxitek's legal fees and expenses, including Dioxitek's payment to the ICC towards the advance on costs (Partial Award, § 285).

400. On 21 January 2021, the ICC Court fixed the ICC Costs of Arbitration (including the Sole Arbitrator's fees and the ICC administrative costs and excluding the legal and other costs of the Parties) at USD 285'400. The unused portion of the advance on costs paid by the Parties will be reimbursed to the Parties by the ICC.

*2)*   *Costs claimed by the Parties, including legal fees and other costs*

401.   In its Statement on Costs submitted on 9 December 2020, Claimant claims reimbursement of *"fees and expenses of legal counsel"* incurred in the second phase of the arbitration and *"Claimant's share of the ICC advance on costs"*.

402.   Claimant's *"share of the ICC advance on costs"* amounts to USD 150'000 (see § 399 above; see also Partial Award, § 278). Claimant's *"fees and expenses of legal counsel"* incurred in the second phase of the arbitration amounts to EUR 165'609.87 (Claimant's Statement on Costs, § 5 and p. 3).

403.   In its Statement on Costs submitted on 3 December 2020, Respondent claims reimbursement of *"legal expenses"* incurred in the second phase of the arbitration in an amount of USD 10'116.33.

404.   In its Answer filed on 4 December 2017, Respondent also requested that Claimant be ordered to bear *"the fees and expenses of the Sole Arbitrator"* and *"the ICC Court's administrative costs and expenses"*, *i.e.* the ICC Costs of Arbitration (see § 111 above). As noted above (§ 399), Respondent's share of the advance on costs paid to the ICC amounts to USD 80'000.

405.   The Sole Arbitrator considers that the legal and other costs incurred by the Parties in the second phase of the arbitration are reasonable in view of the complexity of the dispute and of the extent of the activities performed for presenting the Parties' position.

*3)*   *Allocation of costs*

406.   Article 38(5) ICC Rules provides that, in making decisions as to the allocation of costs, the Sole Arbitrator *"may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and costs-effective manner"*.

407.   The ICC Rules do not foresee the application of a specific allocation test or guidelines, which as a consequence has been recognized as leaving the apportionment of costs to the discretion of the Sole Arbitrator. However, the outcome of the arbitration is a relevant factor that may be taken into consideration in the assessment of the apportionment of the costs between the Parties.

408.   In the Partial Award, the Sole Arbitrator found that Respondent had improperly caused Claimant to plead on the Sole Arbitrator's jurisdiction over Dioxitek and ordered Respondent to reimburse Claimant's and Dioixtek's legal fees and expenses incurred in the first phase of the arbitration (Partial Award, § 286). Such order was expressly made without prejudice to the final determination and allocation of the arbitration costs which will be determined in this Final Award pursuant to Articles 38(1) and 38(4) ICC Rules (Partial Award, § 285).

409. In the second and final phase of the arbitration, Claimant has prevailed on its claims against Respondent and Respondent has lost entirely on its counterclaims against Claimant. Further, the Sole Arbitrator considers that Respondent's basis for opposing Claimant's claims was particularly thin, especially in light of the insufficient explanations and supporting evidence relating to *force majeure* defence (see § 248-277 above) and the unsubstantiated attempt to reopen the Sole Arbitrator's findings in the Partial Award relating to the nature of the contractual relationship between the Parties (see § 278-287 above). Similar insufficiencies apply to Respondent's basis for bringing counterclaims against Claimant insofar as Respondent has failed to produce evidence that would support and allow the Sole Arbitrator to assess Respondent's explanations concerning the legal basis for and the quantum of Respondent's claims against Claimant (see § 359-365 above).

410. The Sole Arbitrator notes that Claimant's lost profit claim has been significantly reduced in the course of the arbitral proceedings. Claimant initially claimed an amount of USD 61'443'137 in its Request for Arbitration, and then reduced its lost profit claim to USD 1'793'872 in the Statement of Claim and subsequent submissions. This decrease has not impacted the amount of work for Respondent in the second phase of the arbitration since the Statement of Claim was the first submission of the second phase on the merits. Nevertheless, the initial and significant amount claimed by Claimant has increased the amount of the advance on arbitration costs to be paid to the ICC, and may have caused concerns to Respondent and its principals. It is also a fact that Claimant is awarded much less than what it initially mentioned in its Request for Arbitration, despite the fact that it prevailed on its (reduced) claim for lost profit. The Sole Arbitrator considers that this element must be taken into account in the allocation of the arbitration costs, and results in a reduction of the amount of costs and legal fees to be awarded to Claimant.

411. In view of the above and exercising his broad discretion on the issue of allocation of costs, the Sole Arbitrator finds that Respondent shall bear 70% of the ICC Costs of Arbitration as well as a portion of approximately 70% of Claimant's legal fees and expenses incurred in the second phase of the arbitration.

412. Accordingly, Respondent shall reimburse to Claimant **USD 57'080** corresponding to the difference between Claimant's payment towards the advance on arbitration costs (USD 142'700 taking into account the reimbursement of USD 7'300 to Claimant by the ICC) and Claimant's share of the ICC Costs of Arbitration (30% of USD 285'400, *i.e.* USD 85'620), as well as **EUR 115'000**.- corresponding to approximately 70% of Claimant's legal fees and expenses incurred in the second phase of the arbitration. Respondent shall bear its own legal fees and expenses.

413. In view of the above, Claimant's prayer for relief no. (viii) is partially granted and Respondent's request for reimbursement of *"legal expenses"* is dismissed.

## XI.   DISPOSITIVE SECTION OF THIS FINAL AWARD

414.   In view of the foregoing, the Sole Arbitrator declares and decides as follows:

I.      Respondent is in breach of its obligations under the U/N Contract to fully pay Claimant for the U308 delivery of June 2016;

II.     Respondent is in breach of its obligation under the U/N Contract to purchase the remaining quantity of U308 to be delivered between 2016 and 2019;

III.    The U/N Contract is avoided for the future;

IV.     Respondent is ordered to pay USD 3'556'862.48 to Claimant corresponding to the outstanding amount owed to Claimant for the U308 delivery of June 2016;

V.      Respondent is ordered to pay to Claimant delay interest on USD 3'556'862.48 at the rate of 3.3289% per annum for the period going from 19 July 2016 to the date of this Final Award, *i.e.* USD 537'847.91;

VI.     Respondent is ordered to pay USD 1'793'872.32 to Claimant for the damages suffered due to the non-performance of its undertakings for the deliveries for the years 2016-2019;

VII.    Respondent shall reimburse to Claimant EUR 115'000 corresponding to a portion of the legal fees and expenses incurred by Claimant in the second phase of the arbitration;

VIII.   Respondent shall reimburse to Claimant USD 57'080 corresponding to a portion of Claimant's payment to the ICC towards the advance on arbitration costs, which have been fixed by the ICC at USD 285'400;

IX.     All other requests, claims, counterclaims and/or relief sought by Claimant and Respondent are dismissed.

Place of arbitration: Lausanne, Switzerland
Date: *1 February 2021*

The Sole Arbitrator:

Prof. Sébastien Besson